[Civ. No. 53631. First Dist., Div. Two. Oct. 18, 1983.]

CHARLES BATES, Plaintiff and Respondent, v.
JOHN DEERE COMPANY et al., Defendants and Appellants;
MISSION INSURANCE COMPANY, Claimant and Appellant.

**COUNSEL**

Cooley, Godward, Castro, Huddleson & Tatum, Thomas A. H. Hartwell, Craig H. Casebeer and William S. Freeman for Defendants and Appellants.

Lawrence Ayres, Anthony Ross, Dawson & Ninnis, Bruce Albion Bailey and Gregory T. Price for Claimant and Appellant and for Plaintiff and Respondent.

## OPINION

ROUSE, J.—Defendants John Deere Company and Deere & Company (Deere) appeal from the judgment awarding plaintiff, Charles Bates, damages for personal injuries which he suffered in an accident involving a cotton picking machine manufactured by defendants.

Mission Insurance Company (lienor) appeals from that part of the judgment entered in favor of defendants and against it as subrogee of plaintiff's employer, Wolfsen Brothers Company, after the trial court found the employer 15 percent comparatively negligent in causing plaintiff's injuries.

Plaintiff was injured on October 27, 1974, while operating a 1969 Deere model 699H cotton picker in a cotton field located on his employer's ranch. The model 699H, driven by a lone operator, is designed to pick two rows of cotton plants at the same time by allowing the plants to pass into either of two intake heads located at the front of the machine, past spindles affixed to rotating drums which strip the cotton bolls from the plants. Each intake head contains two drums, one in the front and one in the rear. Levers controlling the operation and speed at which the drums turn are located only in the cab of the harvester.

Occasionally a drum will become obstructed by cotton stalks, rocks, or other foreign material. In the event of an obstruction, each drum is equipped with a slip clutch which is designed to disengage the drum from the power train at a certain pressure. The slip clutch thereby prevents the drum or spindles from sustaining further serious damage resulting from repeatedly working against the obstruction. When a drum is disengaged in this manner, it emits a characteristic "ratcheting" noise.

The only way an obstruction can be safely cleared from a machine is after the machine has been completely shut down. Operators are warned by the manufacturer to always disengage picking units and to turn off the machine before descending from the cab to attempt to remove an obstruction. Otherwise, once the obstruction is cleared, the unobstructed drum will resume rotating, posing great danger to anyone nearby.

On the day of the accident, as plaintiff was driving the cotton picker between rows of cotton, he heard the ratcheting noise emanating from the area of the picking heads. Sitting in the cab he couldn't tell which head was making the noise, so he stopped the forward motion of the picker and descended from the cab to find out where the obstruction was located. (From the ground level an operator can quickly determine which drum is obstructed if the heads are left running since it will be disengaged while the others

will continue turning.) Once on the ground, plaintiff saw that the left front drum[1] was not turning and that a rock was resting on its bottom spindle between the drum and the pressure plate.

Instead of following the proper procedure for clearing away the rock, i.e., climbing back into the cab and turning the machine off before attempting to dislodge the rock, plaintiff used the toe of his boot to tap the rock away from the drum. Plaintiff was wearing steel-toed boots at the time. Plaintiff thought that he would have enough time to remove his boot from the machine after the rock fell away and before the drum would resume rotating. However, immediately after the rock fell away, the drum began to move and the next spindle grabbed hold of his right boot. The spindle held the steel toe of the boot between the drum and pressure plate with sufficient force to cause the drum to ratchet once again. Although the drum did not turn during the period it ratcheted, its spindles continued to bore into plaintiff's boot at a high rate of speed. Plaintiff could not extricate his foot, could not reach any of the controls of the machine, nor could he attract anyone's attention. This initial ratcheting continued for several minutes during which time plaintiff sustained no serious injury.

As the spindles bore deeper into the boot, the pressure against the drum decreased, causing the slip clutch to briefly reengage the drum, pulling plaintiff's foot in a little further. As time passed, the spindles began eroding away the flesh and muscle tissue on the leg until it was pared down enough to decrease the pressure on the drum sufficiently for the drum to reengage itself momentarily, pulling the leg in another three to four inches. This cycle was repeated many times over a 25-minute period until another worker arrived on the scene and turned off the machine. Plaintiff's leg was so badly damaged in the accident that it had to be amputated a few days later.

At trial before the court, plaintiff conceded that he had acted negligently in attempting to dislodge the obstruction while the machine was still running. Plaintiff also conceded that the machine could not have been designed in a way that would have prevented him from becoming caught in the picking head without impeding its utility. However, he contended that the picker was negligently and defectively designed because it failed to have an emergency cutoff switch located in the area of the picking heads within reach of someone caught in the machine. Plaintiff argued that the absence of such a switch proximately caused him to suffer his severe disabling injury.

Defendants, in turn, primarily tried to show that including a cutoff switch located in the area of the picking heads would ultimately increase the num-

---

[1]From the point of view of the operator standing on the ground looking back at the machine.

ber of accidents by luring operators into the zone of danger; that the switch would be misused by operators as an operational control to save themselves the steps necessary to follow the proper procedure of climbing back into the cab to shut the machine off there. Furthermore, defendants tried to show that an emergency cutoff switch is not necessary if operators follow the proper procedures and heed the warning labels prominently affixed to the machine. The warning label located in the cab provides: "Caution: Keep all shields in place. Disengage and shut off all engine and/or motor power before servicing or unclogging machine. Keep hands, feet and clothing away from power driven parts."

Testimony revealed that it is impossible for an operator to follow this warning and yet still perform the regular maintenance necessary to properly run the machine. Paul Weiler, a defense expert commercial harvester, admitted that every operator at one time or another must be on the ground in the vicinity of the picking heads while the heads are turning to clean the spindles and to troubleshoot other mechanical failures which occur from time to time.

Plaintiff's engineering expert, John Sevart, testified that the design of model 699H was defective because it failed to include an emergency cutoff switch located near the picking heads. In his opinion, such a switch was necessary because of the necessity that an operator sometimes work around the moving heads, the risk of serious injury or death associated with becoming caught in a picking head, the fact that running the machine was a one-person operation, and that the controls for the machine were presently out of reach of an operator if he became caught in a head.

He testified that locating an emergency cutoff switch near the heads was technologically feasible, would be inexpensive, very effective, and would not affect the utility of the cotton picker. Such a switch, wired to cut off power to the fuel pump, would shut down a machine running at full throttle within three seconds after it was actuated. The switch could be guarded in such a way as to eliminate accidental tripping while the machine was in operation. He estimated that the cost of the switch would be approximately $20 per machine and noted that the cost would likely be passed on to the consumer in any event.

He disagreed with defendants' assertion that the switch would be misused by operators in the field as an operational control and would ultimately increase the accident rate, as he believed that the switch could be designed in a way to discourage misuse. He opined that an operator would be able to reach a switch located at the top of the picking head for most types of accidents and that the reaction time for actuating such a switch would be

within two seconds after becoming caught in the machine. Thus, it was his opinion that an operator who knew that the switch existed would be able to shut the machine down within four to five seconds after becoming entangled in the machine.

Dr. Phillip Hinton, plaintiff's treating physician, testified that there was sufficient time after plaintiff's boot was taken into the machine to shut it down before the leg suffered severe disabling injury. The doctor testified that plaintiff received no injury for approximately two minutes after his boot was caught by the spindles because the steel-toed boot caused the machine to ratchet for approximately that amount of time after the intake of the leg. In his opinion, an emergency cutoff switch would prevent injuries of a serious nature such as those suffered by plaintiff.

Numerous operators gave testimony about accidents they had experienced involving cotton pickers substantially similar to model 699H. Each testified that they would have been able to reach an emergency cutoff switch located at the top of a picking head from the positions in which they were caught in the machine.

Based on this and other evidence, the trial court found that defendants negligently manufactured the cotton picker which injured plaintiff; that model 699H was defective in design; and that the negligence and defective design proximately contributed to plaintiff's injuries. The trial court found that plaintiff was negligent, and that his negligence contributed 40 percent to his own injury. Finally, the court found plaintiff's employer 15 percent negligent for failure to have a safety training program for its operators.

The total of plaintiff's damages amounted to $1,047,553. After a 40 percent reduction based on plaintiff's own negligence and prior to deduction of the lien payments made by employer's insurance company, the judgment amounted to $628,531.80. After deduction of the employer lien of $152,417, judgment was entered against defendants in the amount of $476,114.80.

Plaintiff contends that defendants are collaterally estopped from asserting that model 699H is not a defective product by the judgment in a similar case brought against Deere (Demanes v. John Deere Company et al., San Francisco Super. Ct. case No. 701 849.) Demanes sued on behalf of William Gilbert, who was killed after being ingested into an intake head of a Deere model 699 cotton picker. The jury returned a special verdict finding that defendants were liable for decedent's injuries "either through negligence and/or through a defectively designed product . . . ."

On July 25, 1980, judgment for $262,500 was entered against defendants by reason of the special verdict. Defendants appealed from the judgment, but before the appeal was decided the parties agreed to settle the matter. Pursuant to the settlement agreement, Deere agreed to pay plaintiff $218,837 and to dismiss the appeal. In return, plaintiff agreed to give a full release of any further claim against Deere and to dismiss the action with prejudice. The agreement provided that Deere disclaimed "any liability of any kind whatsoever in connection with the events giving rise to [that] action . . . ." The appeal was ordered dismissed on November 9, 1981, pursuant to counsel's stipulation to withdraw the appeal.

Plaintiff asserts that the jury verdict amounts to a judgment on the merits for issue preclusion purposes, despite the fact of the settlement on appeal. We need not decide this issue, however, as yet a third case brought against Deere, based on nearly identical facts, has been decided in favor of the defendants. (Smith v. John Deere Company et al., San Joaquin Co. Super. Ct. No. 146978.)[2] Judgment was entered in that case on December 28, 1982, and the plaintiff's motion for new trial was denied on February 10, 1983. That case is currently pending before the Court of Appeal, Third District (3 Civ. 22786).

■ Thus, the issue before this court becomes whether the collateral estoppel doctrine applies to successive product liability actions involving the same defendant when inconsistent verdicts are presently extant on the issue of liability. This precise question was decided recently by the Court of Appeal, Fifth District, in a case involving a Deere cotton picking machine intake head accident. In *Sandoval* v. *Superior Court* (1983) 140 Cal.App.3d 932, 944 [190 Cal.Rptr. 29], the court held that the collateral estoppel doctrine does not apply under the present circumstances. The court adopted the reasoning expressed in two federal cases (cited therein) that it would violate notions of basic fairness to collaterally apply an adverse judgment against a defendant as long as the judgment relied upon as a basis for the estoppel is, itself, inconsistent with one or more previous judgments rendered in favor of the defendant. (*Ibid.*) The court further reasoned that permitting issue preclusion under such circumstances would undermine the premise that different juries reach equally valid verdicts. (*Ibid.*, and see Rest.2d Judgments, § 29, com. f, p. 295.) We agree completely with the court's reasoning on this issue. Accordingly, we decline to give preclusive effect to the *Demanes* judgment in the present case.

■ Defendants contend that plaintiff's misuse of the cotton picker was not reasonably foreseeable and that the trial court's findings in that regard

---

[2]We take judicial notice of the proceedings in Smith, *supra,* pursuant to sections 452 and 459 of the Evidence Code.

are not supported by substantial evidence. The trial court made specific findings that it was foreseeable that operators would be on the ground in front of the machine for various purposes and that, through inadvertence, operators would be ingested into the intake heads.

Defendants concede that manufacturers must foresee some incidence of operator negligence and misuse. However, defendants assert that plaintiff's conduct exceeded the limits of foreseeable misuse, amounting to wilful abuse.

■ In reviewing the evidence on appeal, all conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. ■ The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ■ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Metzger* v. *Barnes* (1977) 74 Cal.App.3d 6, 9 [141 Cal.Rptr. 257], and cases cited therein.)

■ An appellant, on the other hand, must demonstrate that there is *no* substantial evidence to support the challenged findings. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].)

■ Here, the undisputed testimony showed that the cotton picker will occasionally become obstructed by various types of debris; that an obstructed drum will stop rotating because of its slip clutch; that some types of clogs are more easily removed than others; and that it is impossible for the operator of this model cotton picker to know which unit is clogged without descending from the cab to check the units from the ground. The testimony showed that there were many functions which required an operator to disregard the manufacturer's warning to shut the machine off before leaving the cab and to approach the machine while the heads were turning.

The evidence further showed that it is a relatively common practice for operators to check for suspected obstructions from ground level with the head controls engaged in order to most quickly determine which drum is plugged.

Plaintiff testified that, having determined that the head was clogged by a rock, he was aware that he should shut off the machine before attempting to dislodge the rock but that "it looked so easy to knock [the rock] off," that he thought he could save himself a few steps by just kicking it out of

the machine. Notably, plaintiff had been working 12-15 hours per day, for 34 continuous days before the accident took place.

Deere's engineering expert admitted that it should be foreseeable to a manufacturer that workers will make mistakes and will do things that they should not do around a rotating machine. He also admitted that it is part of an engineer's job to take human fallibility into account when designing a machine. Finally, the testimony showed that Deere had notice that several intake head accidents had occurred prior to plaintiff's injury.

Although this evidence supports the conclusion that plaintiff was decidedly careless in acting as he did, the evidence is likewise supportive of the reasonable inference that Deere knew or should have known that the machine might be misused in this manner. We conclude that the evidence is sufficient to support the trial court's finding of foreseeable misuse.

Similarly, we reject defendants' contention that plaintiff failed to establish that the design of the product was the proximate cause of his injuries.

All a plaintiff need show to establish proximate or legal cause is that a defendant's conduct in some way substantially contributed to the injury and that the circumstances are such that make it just to hold a defendant responsible for the consequences of the accident. (*Valdez* v. *J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 508-509 [124 Cal.Rptr. 467].)

Here, the uncontradicted testimony of plaintiff and of plaintiff's physician established that he suffered no serious injury for at least the first two minutes that his foot was in the machine.

Additionally, there was uncontradicted testimony by several witnesses that an emergency cutoff switch would have shut down the entire machine within three seconds after it was actuated. Based on this and other evidence, it was the opinion of two physicians, plaintiff's engineering expert, and numerous farm laborers who had themselves been injured in cotton picker accidents, that plaintiff would have had enough time to actuate an emergency cutoff switch after being caught by the machine and thereby avoid sustaining any serious disabling injury. This evidence overwhelmingly establishes a causal relationship between the absence of a cutoff switch near the picking heads and the seriousness of the injury suffered by plaintiff. Furthermore, we find nothing about the circumstances of this case to indicate that it would be unjust to hold Deere partially responsible for plaintiff's injuries.

We conclude that the trial court could properly have found that defendants' product proximately contributed in causing plaintiff's injury.

■ Defendants' contention that the trial court improperly applied the risk-benefit analysis of *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], is without merit. *Barker* establishes that once a plaintiff makes a prima facie showing that his injury was proximately caused by the product's design, the burden shifts to the defendant to prove that the product is not defective. (*Id.,* at p. 431.) In order to prove that the product is not defective, a defendant must prove, in light of any relevant factors, that the benefits of the challenged design outweigh the risks of danger inherent in the design. (*Id.,* at p. 432.)

In evaluating the adequacy of a product's design under this standard, a jury may consider, among other relevant factors, "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 431.)

Here, the principal evidence offered in support of the challenged design consisted of the testimony of Deere's design engineer, who opined that placing an emergency cutoff switch near the picking heads might entice operators into believing that they could work around the heads while the heads were turning, without risk of injury. In his opinion, the presence of an emergency cutoff switch would ultimately cause more injuries than the existing design. He admitted on cross-examination that this "attractive nuisance" theory had never been considered by Deere engineers when they were designing the machine or at any time before this litigation was instituted.[3]

In rebuttal, plaintiff offered evidence that the present design of model 699H had proximately contributed to the severe injury or death of several operators in the Fresno area alone, who had inadvertently become ingested into its intake heads. Plaintiff also offered convincing evidence that such an emergency cutoff switch had been technologically feasible for many years prior to the product's design, that it would be very effective, inexpensive and would not affect the utility of the machine in the least.

---

[3]At oral argument, Deere's appellate counsel argued that the risk-benefit analysis of *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, should have been applied to determine only whether Deere's design choice to omit the emergency cutoff switch was a reasonable choice in light of the possible risks inherent in including the switch on the machine. He argued that if Deere's existing design was reasonable, then the product should not be found defective in design. This argument assumes that Deere's engineers had actually considered installing an emergency cutoff switch near the picking heads at the time they designed the machine. Such an assumption is untenable, since the trial testimony of Deere's own design engineer establishes that the switch was never considered by the Deere engineers when they designed the machine.

In light of this evidence, we conclude that the trial court was correct in determining that defendants failed to establish that the benefits of the challenged design outweighed its inherent risks.

Furthermore, having previously determined that the trial court was correct in deciding that the cotton picker was a proximate cause of plaintiff's injury, we are compelled to the conclusion that the trial court correctly found the cotton picker was defective in design. (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 432.)

Defendants next contend that there is no evidence to support the trial court's finding of defective design under the ordinary consumer expectation test. ■ A product may be found defective in design under that test if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when it is used in an intended or reasonably foreseeable manner. (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 429.)

Plaintiff conceded at trial that this test "doesn't help too much" under the present facts. We, too, find it difficult to apply the test to these facts, in part because it is difficult to conceive that an ordinary consumer would know what to expect concerning the safety design of a commercial cotton picker. (See *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 430, citing Wade, *On the Nature of Strict Tort Liability for Products* (1973) 44 Miss. L.J. 825, 829.)

In any event, we need not reach this issue to dispose of the present appeal since we have already concluded that the product was properly found to be defectively designed under the *Barker* "risk-benefit" test.

Finally, we reject defendants' assertion that the trial court acted erroneously in finding that plaintiff was only 40 percent responsible for causing his injury. ■ As with other questions of fact, the appellate court may not substitute its judgment for that of the trier of fact concerning the apportionment of fault under comparative negligence rules if there is any evidence which under any reasonable view supports the apportionment. (*Metzger* v. *Barnes, supra,* 74 Cal.App.3d 6, 9-10.) The party attacking the apportionment must cite all the material evidence which supports the determination and bears the burden of demonstrating that there is no substantial evidence to support it. (*Id.,* at p. 10.) Here, defendants merely rehash their interpretation of the events surrounding the accident. Such arguments merely go to the weight of the evidence presented to the trial court, something which is not a proper subject of review by this court (e.g., *Buckhantz* v. *R. G. Hamilton & Co.* (1945) 71 Cal.App.2d 777, 779 [163 P.2d 756]). Suffice

it to state that there is evidence in the record that if an emergency cutoff switch had been present on the machine, plaintiff might not have suffered any serious injury, despite his own carelessness, because he was wearing steel-toed boots at the time. Consequently, defendants have not sustained their burden of demonstrating that there is no substantial evidence for the trial court's apportionment of negligence.

*Appeal by Mission Insurance Company*

In its appeal, Mission Insurance Company (lienor) challenges the sufficiency of the evidence to support the trial court's verdict that plaintiff's employer, Wolfsen, acted negligently and proximately caused plaintiff's injury by failing to have a safety program for him and its other operators.

This court cannot consider the merits of this challenge, however, because lienor does not have standing to bring the appeal.

"Any party aggrieved" may appeal from an adverse judgment. (Code Civ. Proc., § 902.) It is generally held, however, that only parties of record may appeal. (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 736 [97 Cal.Rptr. 385, 488 P.2d 953]; *Rose* v. *Rose* (1952) 110 Cal.App.2d 812, 813 [243 P.2d 578].) In this instance, lienor initially filed a complaint-in-intervention and apparently was granted leave to intervene in plaintiff's action against Deere. On the opening day of trial, however, lienor requested dismissal of its complaint and reverted to the status of lienholder. The trial court assented to lienor's request and the complaint was dismissed. A person who was a party, but by dismissal ceased to be, is without legal standing as a litigant or as an appellant. (*Butchart* v. *Moorhead* (1929) 101 Cal.App. 659, 662 [282 P.23]; 6 Witkin, Cal. Procedure (2d ed. 1971, pt. I) Appeal, § 114, p. 4114.)

Nevertheless, one who is legally "aggrieved" by a judgment, as lienor here, may become a party of record and obtain a right of appeal by moving to vacate the judgment pursuant to section 663 of the Code of Civil Procedure. (*County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730, 736.) "[One] thereby gains the right of appeal from an order denying [the] motion." (6 Witkin, Cal. Procedure (2d ed. 1971, pt. I) Appeal, § 115, p. 4115.) Unfortunately, lienor made no such motion in this case. Consequently, it lacks standing to appeal.

None of the cases cited by lienor compels a contrary conclusion by this court. The court in *Carlson* v. *Pacific Far East Lines* (1973) 29 Cal.App.3d 883 [105 Cal.Rptr. 885], did not specifically address the issue of standing. Thus, the case cannot be considered authority for a proposition it did not

consider. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) Moreover, under the doctrine of stare decisis we are bound to follow the decision of the Supreme Court in *County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730, 736. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Appellant-lienor's appeal is dismissed. In all other respects, the judgment is affirmed. Respondent Bates shall recover his costs on appeal.

Kline, P. J., and Miller, J., concurred.

A petition for a rehearing was denied November 16, 1983.