[No. H010484. Sixth Dist. May 25, 1994.]

PAUL EIDSMORE, Plaintiff, Cross-defendant and Appellant, v.
RBB, INC., Defendant, Cross-complainant, and Respondent.

## COUNSEL

Bronson, Bronson & McKinnon, José H. Garcia and Michele K. Trausch for Plaintiff, Cross-defendant and Appellant.

Aiman-Smith & Bauman and Randall B. Aiman-Smith for Defendant, Cross-complainant and Respondent.

## OPINION

**WUNDERLICH, J.**—In this action for rescission of a contract to purchase an automobile, the trial court found in favor of respondent RBB, Inc., doing business as Ferrari of Los Gatos, on both appellant's complaint and respondent's cross-complaint for breach of contract. Appellant contends the trial court misinterpreted Vehicle Code section 11713, subdivision (p), which restricts a dealer's collection of deposits on vehicles which are not "available" to the dealer. Appellant further challenges the trial court's factual findings that delivery of appellant's vehicle occurred within a reasonable time and that respondent adequately mitigated its damages upon appellant's breach. We will affirm the judgment.

## BACKGROUND

The subject of this controversy was a "unique and exotic" Ferrari called the "F-40." In September of 1987 appellant learned that this new "super car" was to be introduced in limited numbers in Canada and the United States. Appellant gave respondent a refundable deposit for $25,000, which assured him of receiving the first F-40 that was delivered to respondent. He was not told when he could expect the F-40's to arrive. Appellant placed similar deposits at three other dealerships, with the hope that one would be able to obtain an F-40 for him when they were approved and released for sale.

In early 1990 respondent's salesman, Jack Gordon, called appellant to tell him that the F-40 had passed federal requirements for sale in the United States, and the cars would begin arriving in "a couple of weeks," according to appellant. The parties agreed on a price of $1,325,000, and Gordon went to appellant's home with a written contract for him to sign. The contract contained a provision for a nonrefundable down payment of $100,000. Appellant objected to having to pay an additional $75,000, he said, but was told that if he did not, he would lose his priority status. Appellant gave Gordon the $75,000 and signed the contract on February 6, 1990.

The document listed the buyer as "Paul Eidsmore DBA Eidsmore Imports" and did not provide for payment of sales tax. Appellant testified that Gordon had suggested he be listed under his wholesale license so that if he acquired the F-40 from another dealer, he could buy one from respondent without paying sales tax and then resell it. Although appellant maintained that he wanted an F-40 for his own use, the trial court inferred from the absence of sales tax on the contract that appellant was engaged in a commercial transaction with the intention of reselling the car at a profit.

The contract also included a typewritten term providing for payment on March 23, 1990. Appellant testified that he asked Gordon whether he could delay payment until that date even though the car was to be delivered within two weeks; Gordon then realized he had made an error, and he crossed out the date and wrote in "On Delivery."

Appellant denied that he had insisted on locking in a price in February because the value of the car was increasing; instead, he stated, it was the dealer who wanted to lock in the price because the dealer knew the price was about to fall.

The F-40 did not arrive until August of 1990. During the intervening period the value of the F-40 decreased "drastically." Appellant became

anxious to receive the car so that he could sell the car before it declined further. In April or May he asked for a refund of his down payment; respondent refused the request. On June 7, 1990, appellant sent a letter purporting to rescind the contract,[1] and on June 29, he filed a complaint for rescission and declaratory relief in superior court.

Jack Gordon also testified at trial. He stated that when he discussed the delivery of the F-40 with appellant on the day they signed the contract, he told appellant that he "[wasn't] exactly sure when the car was going to come in." He did assure appellant, however, that the cars "were definitely coming and [appellant] was definitely getting the first car." When asked about the typewritten date of March 23, 1990, on the contract, he explained that the company's computer automatically generated a payment date 45 days from the date of the contract. Gordon crossed off the date, he said, because "there was no way to know exactly what date a Ferrari is going to come in."

Gordon denied that he had ever told appellant that the car would be delivered within a couple of weeks, or by March 23, or even in any particular month. In his 16 years at this Ferrari dealership he had learned to be "very careful not to say anything exact about when Ferrari cars are coming," because the manufacturer was a "small boutique company, and they do things their way." On cross-examination, however, he admitted that he "may have told [appellant] [an] approximate time that [the car] might be there." Upon further questioning Gordon recalled that he "probably give [sic] him an indication that the car was going to be there in the future sometime, that it was delivered from Ferrari, but Ferrari hadn't given us any exact date yet. So anything was speculation on anyone's part."

Appellant presented a rebuttal witness, Terry Buch, who was in the garage at appellant's home on February 6, 1990. Buch testified that after appellant and Gordon worked out the details of the contract they came into the garage. When asked "when he thought the car might be in," Gordon responded that it "should be in within the next few weeks."

Respondent's president was Brian Burnett. Burnett testified that in February 1990 when the contract was executed with appellant, the value of the F-40 was increasing daily. At that time, he said, the car was worth $1.5 million but appellant had been on the waiting list for a long time and both parties were satisfied with the $1,325,000 price. During February or March, however, the value of the F-40—indeed, of all Ferraris—began to fall "fairly fast." By August 25, 1990, when he sold the first F-40 to another customer, the car brought in about $970,000.

---

[1]The letter of rescission was based on Civil Code section 2982.9, claiming failure to secure financing; it did not allege illegality of the contract.

As for delivery time, "[n]obody knew when the F-40 would be delivered. They just knew it would be deliverable in 1990." At that time, "[a]ll that had happened [was that] we had gotten a letter from Ferrari that the car had passed the EPA and DOT tests. The cars weren't even built yet. The line didn't start for probably a month or two after they got that letter. They hadn't even started building them." Not until July 13, 1990, did Burnett receive notice that delivery would "soon start." The first car arrived on August 8, 1990.

Appellant's complaint, as finally amended, asserted one cause of action for declaratory relief and four causes of action for rescission, citing Civil Code sections 2982.9, 1667, and 1689. Respondent cross-complained for breach of contract, intentional misrepresentation, and negligent misrepresentation.

Appellant claimed, inter alia, that the contract between the parties was unlawful under Vehicle Code section 11713, subdivisions (b) and (p), and was therefore subject to rescission. Appellant moved for summary judgment on this ground, arguing that respondent had illegally accepted his deposit because the vehicle was not "available to the dealer" within the meaning of Vehicle Code section 11713, subdivision (p). The court denied the motion, reasoning that "the evidence offered does not establish as a matter of law that the subject vehicle was not 'available' to Ferrari of Los Gatos at the time the parties entered into their February 6, 1990, agreement."

After a court trial, judgment was entered for respondent. The court specifically found that appellant had entered into a commercial transaction which did not violate Vehicle Code section 11713. Furthermore, because the contract did not specify a delivery date, only a reasonable time was required for delivery under Civil Code section 1557, and delivery of this vehicle was made within a reasonable time. On respondent's cross-complaint, the court found that respondent was entitled to retain the $100,000 deposit as damages, but the evidence of a greater amount was insufficient.

DISCUSSION

1. *Standard and Scope of Review*

Appellant challenges three of the trial court's rulings below: (1) that no violation of Vehicle Code section 11713 occurred; (2) that the car appellant had ordered was delivered within a reasonable time; and (3) that respondent

adequately mitigated its damages after appellant's breach. Appellant correctly observes that the first issue requires statutory interpretation, which is a matter for the reviewing court's independent determination. ■ Appellant's second and third contentions, on the other hand, are questions of fact, which we review according to the substantial evidence rule. Thus, with regard to these issues, we examine the entire record to determine whether there is any substantial evidence, contradicted or uncontradicted, to support the court's factual findings.[2] Where the evidence conflicts or is capable of conflicting inferences, the appellate court will not substitute its deductions for those of the fact finder. (*Bates* v. *John Deere Co.* (1983) 148 Cal.App.3d 40, 49 [195 Cal.Rptr. 637, 60 A.L.R.4th 663].) Further, although appellant repeatedly contests the weight and credibility of the testimony presented, this court will not reweigh evidence, reappraise the credibility of witnesses, or resolve factual conflicts contrary to the trial court's findings, but will only decide whether there is substantial evidence to support these findings. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

### 2. *Meaning of "Available" in Section 11713*

■ Appellant first contends that the trial court incorrectly construed the word "available" as used in Vehicle Code section 11713, subdivisions (b) and (p).[3] At the time of the events at issue this section provided, in pertinent part: "It is unlawful and a violation of this code for the holder of any license issued under this article to do any of the following: . . . (b) To advertise or offer for sale or exchange in any manner, any vehicle not actually for sale at the premises of the dealer or *available* to the dealer from the manufacturer or distributor of the vehicle at the time of the advertisement or offer. . . . (p) To accept a purchase deposit relative to the sale of a vehicle, unless the vehicle is present at the premises of the dealer or *available* to the dealer directly from the manufacturer or distributor of the vehicle at the time the dealer accepts the deposit. . . ." (Stats. 1988, ch. 1583, § 3, pp. 5734-5735, italics added.)

Appellant urges a construction of subdivisions (b) and (p) of section 11713 to require that the vehicle be either at the dealership or *immediately*

---

[2] We engage in this review without the benefit of respondent's statement of facts. Instead of reciting the facts as presented to the trial court, respondent merely summarizes the trial court's findings. As often as appellate courts have reminded parties of the standard of review in resolving factual disputes on appeal, respondent still appears to be laboring under the misapprehension that the reviewing court "disregards" conflicting evidence when examining the record, and that it will not disturb factual findings absent an "abuse of discretion."

[3] All further statutory references are to the Vehicle Code unless otherwise specified.

obtainable in order for the dealer to advertise the vehicle or accept a deposit for it.[4] Respondent maintains that section 11713 does not include language indicating that the vehicle be "immediately" obtainable, and therefore the word "available" must be interpreted according to the particular circumstances of each transaction.

Respondent's position has merit. Although it is true that courts do not normally engage in judicial construction of statutes where the meaning of the language used is clear (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 800 [268 Cal.Rptr. 753, 789 P.2d 934]), this principle is inapplicable when a literal construction would lead to absurd or unjust results or contravene legislative intent. (Cf. *Times Mirror Co.* v. *Superior Court* (1991) 53 Cal.3d 1325, 1334, fn. 7 [283 Cal.Rptr. 893, 813 P.2d 240] [plain meaning of words in a statute may be disregarded if necessary to give effect to legislative intent or if literal interpretation gives rise to absurd results]; *Ornelas* v. *Randolph* (1993) 4 Cal.4th 1095, 1105 [17 Cal.Rptr.2d 594, 847 P.2d 560] [even plain language may be disregarded if contrary to legislative intent or absurd results follow].) Thus, it is important to consider the objective of the Legislature in enacting the provision and the consequences that might flow from a particular construction. (*Ornelas v. Randolph, supra,* 4 Cal.4th at p. 1105; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Western Land Office, Inc.* v. *Cervantes* (1985) 175 Cal.App.3d 724, 742 [220 Cal.Rptr. 784]; *Sylva* v. *Board of Supervisors* (1989) 208 Cal.App.3d 648, 652 [256 Cal.Rptr. 138].) The term "available" in section 11713, subdivision (p), though clear on its face, is ambiguous in the context of transactions involving rare or custom-built vehicles. Appellant's plain-meaning interpretation of "available" in section 11713 would make such transactions economically impracticable for the dealer, thereby serving the needs of neither dealer nor customer.

Subdivision (b) of section 11713 prevents unscrupulous dealers from attracting customers to the premises with advertisements of vehicles that do not exist; subdivision (p) protects customers from giving dealers money in advance for products that do not arrive, if at all, for an unreasonable length of time. On the other hand, a significant service provided by automobile dealers is to place orders for customers who request vehicles in limited supply or those fitted with custom features. Receipt of a nonrefundable deposit from the customer enables the dealer to offer this service while retaining some measure of protection in the event that the customer cancels the purchase and leaves the dealer with unprofitable inventory. Where the

---

[4]Although appellant appears to rely on subdivision (b) of this statute, the essence of his complaint is directed at subdivision (p); hence, our discussion will primarily be focused on the latter provision of section 11713.

customer knows that the vehicle he or she is requesting is one of limited production or requires special treatment before delivery, particularly one that is unusually expensive, the dealer should not be precluded from accepting a deposit as a condition of agreeing to sell that vehicle to the customer.

Thus, in light of the purpose of section 11713 and the harsh consequences of a literal interpretation of its language, we conclude that the word "available" must be read according to the circumstances of the transaction at issue. The availability of a particular vehicle for purposes of advertising and acceptance of deposits will depend on the nature of the product, the stage of its development when the customer places an order, the probability that it will be delivered by the date promised in the contract (or within a reasonable time if the contract does not specify a delivery date), and the customer's awareness of these conditions.

In this case, appellant pursued an investment opportunity in an effort to secure a rare and distinctive vehicle as soon as it was approved for release to the public. To ensure receipt of one of the first F-40's to reach the market he placed deposits at four separate dealerships. In February 1990 when the contract was signed, the cars destined for the United States had not yet been built and no one knew when they would arrive, although they were expected in 1990. Each dealership was to receive only a limited allotment of these special cars, and their value was well over $1 million even before they were distributed in the United States.

Appellant was not an uninformed consumer but a sophisticated and experienced investor in Ferrari automobiles: he already owned three other Ferraris and possessed a wholesaler's license to sell them himself. He had visited the factory in Italy in an effort to obtain an F-40 directly, and he knew the United States market was volatile for this product. Contrary to his claim at trial, the court found appellant had not been promised delivery in "a couple of weeks"—or in fact at any particular time.

In light of these circumstances, the trial court did not err in refusing to find a violation of section 11713, subdivision (p). Once the F-40 was approved for the United States market, respondent could reasonably consider the F-40 "available" for the purpose of accepting nonrefundable deposits from knowledgeable investors like appellant, thereby obtaining committed buyers for its supply of these high-priced cars.

### 3. *Delivery Within a "Reasonable" Time*

■ Appellant alternatively contends that rescission was warranted under Civil Code section 1689, subdivision (b)(4)[5] because his F-40 was not delivered to him within a reasonable time. Since the contract did not specify a delivery date, a reasonable time is permitted under Civil Code section 1657.[6] Appellant acknowledges that the reasonableness of time for performance is a question of fact which depends on the circumstances of the particular case. (*Lyon v. Goss* (1942) 19 Cal.2d 659, 673 [123 P.2d 11]; *Consolidated World Investments, Inc.* v. *Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 381 [11 Cal.Rptr.2d 524].)

The trial court found that the subject of the contract, a "very [*sic*] unique and exotic" automobile, was delivered within a reasonable time considering the limited nature of its production and distribution. As Gordon had noted, the F-40 was being manufactured by a "small boutique company" where "they do things their way." Furthermore, the parties had been negotiating since September 1987; by February 1990, distribution in this country had only just been approved.

That the contract took place during a "fluctuating investment market" for this vehicle does not by itself render the delay in delivery unreasonable as a matter of law, as appellant contends; as noted above, the trial court found appellant to be an informed buyer engaged in a commercial transaction with the hope of reselling the vehicle at a profit. In entering this contract appellant was assured the first F-40, but he also assumed the risk that the car might decline in value before delivery. That decline in fact commenced shortly after the parties signed the contract, making appellant's investment less desirable than he had anticipated. Appellant unjustifiably and unsuccessfully attempted to pass the resulting loss on to respondent.[7]

This record, viewed in the light most favorable to the judgment, supports the trial court's factual findings with respect to appellant's request for rescission under Civil Code section 1689, subdivision (b)(4). The six-month period between the execution of the contract and the arrival of the first F-40 was reasonable under the circumstances.

---

[5]This provision entitles a party to rescission of a contract "[i]f the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause."

[6]This statute provides, in pertinent part: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."

[7]The trial court expressly found that appellant sought rescission "not because of a delayed delivery but . . . because the price of the vehicle was falling and [he] did not wish to be obligated under the contract in light of the falling market for the F-40 vehicle."

### 4. *Mitigation of Damages*

█ Appellant finally contends that the trial court erred in finding that respondent adequately mitigated its damages for purposes of recovery on its cross-complaint. This issue again was a question of fact for the trial court to resolve. (*Sackett* v. *Spindler* (1967) 248 Cal.App.2d 220, 239 [56 Cal.Rptr. 435]; *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 949 [122 Cal.Rptr. 470].) We find sufficient evidence in the record to support the trial court's factual findings.

Appellant began asking to be excused from the contract in April or May, without success. In "May or June" Paul Cote, one of respondent's salesmen, was approached by Nick Marks, a customer who wanted to buy the first F-40 respondent was to receive. Although Marks offered $1,350,000, Cote did not sell the car to Marks because respondent was holding appellant's deposit. Appellant's letter of rescission was dated June 7, 1990, and his complaint was filed June 29, 1990.

The record does not establish that Marks's offer was received after appellant's formal attempt to rescind his contract. Thus, respondent was not shown to have breached an obligation to mitigate its damages by refusing Marks's offer. The trial court properly found that appellant did not satisfy his burden to prove this affirmative defense.[8]

#### DISPOSITION

The judgment is affirmed.

Premo, Acting P. J., and Mihara, J., concurred.

A petition for a rehearing was denied June 17, 1994, and appellant's petition for review by the Supreme Court was denied September 26, 1994.

---

[8]Appellant complains that the trial court incorrectly "discounted" the Marks offer because it had not materialized into a deposit or written contract. This issue is a red herring—we review the trial court's ruling, not its reasoning. Here, the finding that failure to mitigate had not been proven was supported by the record, and the court's theory regarding an absence of deposit or contract is irrelevant.