[No. B132931. Second Dist., Div. Four. Dec. 2, 1999.]

DEPARTMENT OF CORRECTIONS, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and GRACE
GARCIA, Respondents.

**COUNSEL**

Richard A. Krimen; Robert W. Daneri; and Louis Harris for Petitioner.

Rose, Klein & Marias and Lilia Ballesteros for Respondent Grace Garcia.

No appearance for Respondent Workers' Compensation Appeals Board.

## OPINION

### CURRY, J.—

#### INTRODUCTION

On June 14, 1999, the State of California, Department of Corrections, California Institute for Women (hereafter Institute), filed a petition for writ of review after the Workers' Compensation Appeals Board (hereafter WCAB) found that Grace Garcia, a correctional officer employed by the department, had suffered a work-related psychiatric injury, which produced a 9 percent permanent disability. The WCAB further found that her employment experiences were at least 35 percent of the causation of this injury. Neither the WCAB nor Garcia has filed an answer to this petition.

We conclude that the WCAB applied an incorrect threshold for compensability, and annul the WCAB decision and remand the matter for further proceedings.

#### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Grace Garcia was employed by the Institute from December of 1990 through October 26, 1995, as a part-time correctional peace officer.

Garcia was considered a good officer. In April 1996, Garcia filed a claim for workers' compensation benefits, alleging injury to her psyche for the period from October 26, 1994, to October 26, 1995. The Institute denied Garcia's claim.

Garcia alleged that as the result of state budget cuts, her hours were reduced from 160 hours per month to a range of 27 to 40 hours per month. She contended that this change was inconsistent with her seniority, and resulted in shortage of money and sleep, child care problems and stress.

Garcia also had other complaints concerning work. She at times had very busy, responsible but confrontational contacts with inmates. On one occasion a search yielded a drug bust. As a result, Garcia had to testify and afterwards was accused by inmates of setting up the inmates involved. Garcia told of another instance when she was ordered to provide a urine sample. The urinalysis took three hours, and a lieutenant told her to drink the sample after Garcia provided it. Garcia was quoted by an examining physician as referring to inmates who tried to tempt her with drugs and sex. Eventually, Garcia's treating doctor recommended that she leave work due to stress. She did leave and she never returned.

To support Garcia's claims, she obtained medical-legal reports from Psychiatrist Paul De Silva. Dr. De Silva diagnosed a preexisting delusional and panic disorder with agoraphobia, which was aggravated by and predominantly caused by work if the scheduling problems were actual employment events and not nondiscriminatory, good faith personnel actions. He also indicated that if the events were considered to be legitimate, good faith nondiscriminatory employment actions, the causation was nonindustrial. Dr. De Silva further found 75 percent of Garcia's slight to moderate work impairment to be industrial.

Psychiatrist Anthony McAdoo, reported for the Institute. Dr. McAdoo's history was that Garcia's younger brother was schizophrenic and he concluded Garcia had the same diagnosis, which was hereditary and not caused by stress or specific events at work. In another report, Dr. McAdoo indicated the etiology of schizophrenia was unknown, although genetic vulnerability was a significant factor.

At the trial, Garcia confirmed her complaints to Dr. McAdoo, but denied telling him that her brother was schizophrenic. Instead, she told him that her brother had mental problems from a traumatic birth and drugs. She acknowledged that her father died in 1993, which caused emotional difficulties for which she sought psychiatric treatment. Although Garcia conceded the breakup of her marriage in 1991 was unpleasant, she denied the dissolution resulted in lasting effects.

Lieutenant Carolyn Chambers also testified at trial. Chambers stated that she supervised Garcia for four years; that Garcia was a good officer; that certain assignments required a great deal of responsibility, which was stressful but rewarding; and that inmates' accusations were common. She indicated that in 1993, there had been a reduction in hours for seven to eight months.

Sergeant Moses Diaz, who was in charge of scheduling, testified that assignments were fairly distributed and that employees generally received advance notice of their assignments. Diaz also indicated Garcia was accommodated whenever possible.

The workers' compensation judge (hereafter WCJ) found that Garcia sustained psychiatric injury resulting in a 9 percent permanent disability, from the drug bust aftermath and inmate taunts, but not from scheduling. In the opinion on decision, the WCJ explained the findings were based on the range of evidence between Garcia and Drs. De Silva and McAdoo, and therefore at least 35 percent of causation was due to employment as related

by Garcia. In addition, the WCJ found the scheduling reasonable and nondiscriminatory, apparently referring to Labor Code section 3208.3, subdivision (h),[1] which states, "No compensation under this division shall be paid by an employer for a psychiatric injury if the injury was substantially caused by a lawful, nondiscriminatory, good faith personnel action. The burden of proof shall rest with the party asserting the issue."

The Institute filed a petition for reconsideration, contending that the WCJ's finding of at least 35 percent industrial causation was insufficient to satisfy section 3208.3, subdivision (b)(1), which provides that "[i]n order to establish that a psychiatric injury is compensable, an employee shall demonstrate by a preponderance of the evidence that actual events of employment were *predominant* as to all causes combined of the psychiatric injury." (Italics added.) The Institute argued that "predominant" should be interpreted as being more than 50 percent.

In addition, the Institute argued that the WCJ's finding of 35 percent industrial causation is relevant solely to section 3208.3, subdivision (b)(2), which states, "[n]otwithstanding paragraph (1), in the case of employees whose injuries resulted from being a victim of a violent act or from direct exposure to a significant violent act, the employee shall be required to demonstrate by a preponderance of the evidence that actual events of employment were a substantial cause of the injury." Substantial cause is defined by section 3208.3, subdivision (b)(3) as meaning, ". . . at least 35 to 40 percent of the causation from all sources combined." The Institute contended that because no violent act with physical force was involved, section 3208.3, subdivision (b)(2) could not support the WCJ's decision.

Finally, the Institute argued the award was not supported by substantial evidence because Dr. De Silva expressly conditioned his opinion regarding predominant causation on whether Garcia's work schedule was a legitimate, good faith personnel action, and the WCJ determined her work schedule to be such.

In the WCJ's report on reconsideration, the WCJ stated that although Garcia complained about scheduling, Garcia had also attributed work-related stress to dealing with inmates, as well as to threats following the drug bust. The WCJ noted that Garcia's evidence concerning these threats was unrebutted. The WCJ criticized Dr. McAdoo for ignoring these stresses while failing to explain how Garcia had been able to adequately perform her duties for years. However, the WCJ also expressed dissatisfaction with Dr. De

---

[1]All statutory references are to the Labor Code, unless otherwise indicated.

Silva's report, which focused on scheduling, and asked that an independent medical examiner be appointed if the WCAB were to find the medical reports inadequate.[2] The WCAB adopted the WCJ's reasons and decision and denied reconsideration.

DISCUSSION

 The Institute contends that section 3208.3, subdivision (b)(1), and not section 3208.3, subdivision (b)(2), applies because Garcia was not a victim of, nor directly exposed to, a violent act. The Institute thus argues that the WCJ's finding of 35 percent industrial causation does not establish compensable injury because the phrase "predominant as to all causes" in section 3208.3, subdivision (b)(1) means "more than 50 percent."

In addition, the Institute maintains that section 3208.3, subdivision (h) forecloses compensability based on Dr. De Silva's opinion because the WCJ found that scheduling was a nondiscriminatory, good faith personnel action.[3]

A. *Predominant as to All Causes*

The interpretation of the phrase "predominant as to all causes" in section 3208.3, subdivision (b)(1) is a question of statutory interpretation that we review de novo. (*Eidsmore* v. *RBB, Inc.* (1994) 25 Cal.App.4th 189, 195 [30 Cal.Rptr.2d 357].) "The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].) Furthermore, "[s]tatutes are not to be read in isolation, but must be construed with related statutes. [Citation.]" (*Ibid.*)

---

[2]The WCJ may have been referring to *Tyler* v. *Workers' Comp. Appeals Bd.* (1997) 56 Cal.App.4th 389 [65 Cal.Rptr.2d 431], in which this division interpreted sections 5701 and 5906 as authorizing a WCJ, or the WCAB, to order further development of the record at any time during the proceedings, including obtaining additional medical evidence concerning the finding of injury, to enable a complete adjudication of the issues consistent with due process. (See also *Keulen* v. *Workers' Comp. Appeals Bd.* (1998) 66 Cal.App.4th 1089 [78 Cal.Rptr.2d 500], *M/A Com-Phi* v. *Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1020 [76 Cal.Rptr.2d 907], and *McClune* v. *Workers' Comp. Appeals Bd.* (1998) 62 Cal.App.4th 1117 [72 Cal.Rptr.2d 898].) However, *Tyler* explained this could not include an independent medical examination for injuries occurring after January 1, 1991.

[3]Although Garcia did not file a return, we have independently reviewed the record and decided the issues on the merits. (*County of San Bernardino* v. *Superior Court* (1994) 30 Cal.App.4th 378, 382, fn. 6 [35 Cal.Rptr.2d 760].)

Section 3208.3, subdivision (b)(1) does not define the numerical percentage of causation required to establish predominant causation. However, the purpose of section 3208.3 is to limit liability for psychiatric injury claims. (*Bray* v. *Workers' Comp. Appeals Bd.* (1994) 26 Cal.App.4th 530 [31 Cal.Rptr.2d 580].) In *Bray*, the court held that a posttermination psychiatric injury not resulting from pretermination events was noncompensable. (26 Cal.App.4th at p. 540.) Citing *Livitsanos* v. *Superior Court* (1992) 2 Cal.4th 744, 753-755 [7 Cal.Rptr.2d 808, 828 P.2d 1195], the reform amendments in 1993 to section 3208.3, and the Governor's comment that these amendments would limit fraud, the *Bray* court concluded that public policy favored limiting compensation for work-related psychiatric injury.[4]

Especially indicative of this public policy is the increase in the threshold of compensability from the previous law. Prior to the 1993 reforms, section 3208.3, subdivision (b) required an employee to demonstrate by a preponderance of the evidence that actual events of employment were responsible for *10 percent* or more of the total causation from all sources contributing to the psychiatric injury.

In our view, the phrase "predominant as to all causes" is intended to require that the work-related cause has greater than a 50 percent share of the entire set of causal factors. The word "predominant," ordinarily understood, means "having superior strength, influence, or authority." (Webster's Collegiate Dict. (1995) p. 918.) Because the threshold for injury due to *violent acts* is 35 to 40 percent, the word "predominant" must be construed as setting a higher threshold. Otherwise the threshold of compensability for claims of injury due for violent acts, which are reasonably expected to produce emotional trauma, would be the same or greater than the analogous threshold for claims of injury due to nonviolent acts. At least one authority has concluded the word "predominant" in section 3208.3, subdivision (b) indicates a threshold of more than 50 percent.[5] Given the statutory language and public policy at issue, we agree.

B. *Sufficiency of the Evidence*

The Institute also contends that the WCJ's findings do not support the order denying reconsideration, and (2) substantial evidence does not exist for these findings. However, in view of our conclusion that an incorrect legal

---

[4]Section 3208.3, subdivision (c) states, "It is the intent of the Legislature in enacting this section to establish a new and higher threshold of compensability for psychiatric injury under this division."

[5]St. Clair, California Workers' Compensation Law and Practice (5th ed. 1996) Arising out of Employment (Causal Relationship), section 6.4.3(c), page 323.

standard was applied below, we do not address this issue. The medical record must contain the correct history and legal theory necessary to support a finding of compensable injury. (*Bracken* v. *Workers' Comp. Appeals Bd.* (1989) 214 Cal.App.3d 246, 256 [262 Cal.Rptr. 537].) Here, Dr. De Silva concluded that Garcia's psychiatric injuries were predominantly caused by her work if, and only if, Garcia's work assignments were not legitimate, good faith personnel actions.[6] In our view, Dr. De Silva's testimony must be reassessed in light of the correct legal threshold regarding predominant causation.

## DISPOSITION

The decision of the WCAB is annulled and the matter is remanded for further proceedings consistent with this opinion.

Epstein, Acting P. J., and Hastings, J., concurred.

---

[6]We observe that the WCJ recommended to the WCAB that the medical record be further developed if needed. We express no opinion regarding this suggestion.