[No. A101872. First Dist., Div. Five. Jan. 9, 2004.]

PACIFIC GAS & ELECTRIC COMPANY, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and CLIFFORD
BRYAN, Respondents.

1176

**COUNSEL**

Finnegan, Marks & Hampton, Michael A. Marks and Meredith L. Fay for Petitioner.

Warren W. Greene for Respondent Clifford Bryan.

No appearance for Respondent Workers' Compensation Appeals Board.

Richard M. Jacobsmeyer as Amicus Curiae on behalf of Respondent Workers' Compensation Appeals Board.

## OPINION

**JONES, P. J.**—Pacific Gas & Electric Company (PG&E) contends the Workers' Compensation Appeals Board (WCAB) erred when it awarded benefits to respondent Clifford Bryan for work-related psychiatric injury. In analyzing this claim, we must determine whether the circumstances cited by the WCAB constitute "events of employment" under Labor Code section 3208.3, subdivision (b)(1)[1]. We conclude that some of the factors relied on by the WCAB were inappropriate. Employee stress that results from fluctuations in the value of an employer's stock or from uncertainty about an employer's future in the face of a downturn in the employer's business is not a compensable event of employment under the Labor Code. Accordingly, we will annul the WCAB's decision and remand for further proceedings.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The tumultuous deregulation of California's utility industry and the related uncertainty about PG&E's financial health provide the backdrop for this case. Respondent Bryan had worked for PG&E for over 30 years. He started as a meter reader and eventually became a "collector." As a "collector" he went to the homes of delinquent customers to either collect money or turn off the gas and electric service. In the course of 13 years in this "thankless job" Bryan was "dog-bitten, cursed at, chased out, [had] rocks thrown at [him], guns shoved in [his] chest, [and] called everything you can imagine." Nonetheless, Bryan said he "loved that job" because he "could walk away from it."

In 1998, Bryan's job was eliminated, and he "was told [PG&E] would find a job for him in the office." Bryan and another "downsized" collector bid on two available customer service jobs, one working at a front counter in a local PG&E office, and the other in a back office doing paperwork. The other employee with greater seniority took the back office job; Bryan took the job at the front counter.

Bryan's new job was also stressful. He worked in a small room serving customers who "did not like the company." He was "out there every day listening to abusive comments." The "smell was atrocious." Some customers would even threaten violence.

The stress level in Bryan's work environment worsened in 2000, "when the company started to downsize." The "state was going through a period of brownouts and blackouts and the company was going into serious debt. There was an increase in customers and in customer complaints. The general public

---

[1] All further section references will be to the Labor Code.

[Bryan] dealt with thought that it was a big scam and that PG&E manipulated the rates and the product market." In 2000, Bryan started having chest pains, for which he sought medical care.

The pressure on Bryan increased yet again when PG&E "filed Chapter 11 bankruptcy April 6, 2001. [Bryan] was concerned, as were all PG&E employees, when the bankruptcy was filed. He had savings in stock in the company. He had all his stock in PG&E from the day he was eligible to buy PG&E stock. In April 2001 . . . he had approximately $200,000 in PG&E stock."

The pressure on Bryan became so great that he was forced to leave work on October 5, 2001.

PG&E sent Bryan to Dr. Brian Jacks for a psychiatric evaluation. Dr. Jacks said Bryan was experiencing a "transient situational disturbance." He said there was "very little significant history . . . of work stress" and that the stress that did exist "might be considered a routine personnel matter." Dr. Jacks attributed Bryan's problems to "personal non-industrial stressors" including the fact that Bryan had a hernia, that he was a recovering alcoholic, that his father had died recently, and that his daughter had medical problems. Dr. Jacks estimated that 35 to 40 percent of Bryan's emotional difficulties were caused by his work.

The applicant's physician who evaluated Bryan, Dr. Allen Enelow, dis-agreed with Dr. Jacks in virtually every respect. He said Bryan was suffering from "major depressive disorder" and that he was "temporarily totally disabled." Dr. Enelow believed the condition was "entirely industrial" and said he could find "no evidence for apportionment."

These differing conclusions were weighed by a workers' compensation judge (WCJ) who ruled Bryan was not entitled to benefits because work stress was not the predominant cause of his psychiatric injury within the meaning of section 3208.3, subdivision (b)(1).

Bryan filed a petition for reconsideration. The WCAB granted the petition and ruled Bryan was entitled to benefits. According to the Board "the downsizing of [Bryan's] employer . . . [Bryan's] daily interactions with irate PG&E customers, the loss of the value of [Bryan's] PG&E stock, and [Bryan's] concern about the future of PG&E and his retirement funds, were all actual events of employment that were predominant as to all causes of [Bryan's] psychiatric injury."

A dissenting board member disagreed. He thought Dr. Jacks's evaluation was more persuasive and that "[t]he record simply [did] not reflect that

[Bryan's] employment was the *predominant* cause of his psychic distress." The dissenting board member also said the fact that Bryan sustained a loss because he owned stock in a company that happened to be his employer was not an "actual event" of Bryan's employment that could support an award of benefits.

PG&E's petition for writ of review followed.

## II. DISCUSSION

PG&E contends the WCAB interpreted section 3208.3, subdivision (b)(1) incorrectly when it awarded Bryan benefits for psychiatric injury.

The principles which guide our analysis are well settled. "Although the WCAB's findings on questions of fact are conclusive (§ 5953), the construction of a statute and its applicability to a given situation are matters of law that are reviewable by the courts." (*Rex Club v. Workers' Comp. Appeals Bd.* (1997) 53 Cal.App.4th 1465, 1470–1471 [62 Cal.Rptr.2d 393].) "The [WCAB's] administrative construction of statutes that it is charged to enforce and interpret is entitled to great weight unless it is clearly erroneous. [Citation.]" (*Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1995) 38 Cal.App.4th 820, 828 [45 Cal.Rptr.2d 197].) "An erroneous interpretation or application of law by the WCAB is a ground for annulment of [its] decision. [Citations.]" (*Rex Club v. Workers' Comp. Appeals Bd., supra,* 53 Cal.App.4th at p. 1471; see also *Lockheed Martin Corp. v. Workers' Comp. Appeals Bd.* (2002) 96 Cal.App.4th 1237, 1241 [117 Cal.Rptr.2d 865].)

A reviewing court's "first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance . . . to every word, phrase and sentence in pursuance of the legislative purpose." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) "Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.]" (*Id.* at p. 1387.) "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Ibid.*)

■ "[S]ection 3208.3 was enacted as part of the Margolin-Greene Workers' Compensation Reform Act of 1989. It is part of the Legislature's response to increased public concern about the high cost of workers' compensation coverage, limited benefits for injured workers, suspected fraud and widespread abuses in the system, and particularly the proliferation of workers'

compensation cases with claims for psychiatric injuries." (*Hansen v. Workers' Compensation Appeals Bd.* (1993) 18 Cal.App.4th 1179, 1183–1184 [23 Cal.Rptr.2d 30], fn. omitted.) As originally enacted, subdivision (b) of the statute provided, "In order to establish that a psychiatric injury is compensable, an employee shall demonstrate by a preponderance of the evidence that actual events of employment were responsible for at least 10 percent of the total causation from all sources contributing to the psychiatric injury." (Stats. 1989, ch. 892, § 25, p. 3003.) However, in 1993 the Legislature amended section 3208.3, subdivision (b)(1) to impose a significantly higher quantum of proof to establish that a psychiatric injury is compensable. The section now states, "In order to establish that a psychiatric injury is compensable, an employee shall demonstrate by a preponderance of the evidence that actual events of employment were predominant as to all causes combined of the psychiatric injury." This language has been interpreted to mean that benefits under section 3208.3, subdivision (b)(1) may be awarded only when industrial factors account for more than 50 percent of a psychiatric disability. (*Department of Corrections v. Workers' Comp. Appeals Bd.* (1999) 76 Cal.App.4th 810, 816 [90 Cal.Rptr.2d 716].)

Section 3208.3, subdivision (c) underscores the Legislature's intent that claims seeking benefits based on psychiatric injuries be evaluated strictly. It states, "It is the intent of the Legislature in enacting this section to establish a new and higher threshold of compensability for psychiatric injury under this division."

The question we must decide in this case is whether the factors cited by the WCAB are properly characterized as "events of employment" within the meaning of section 3208.3, subdivision (b)(1).

█ The statutory language indicates that two conditions must be satisfied before a particular factor can support an award of benefits under section 3208.3, subdivision (b)(1). First, the factor must be an "event"; i.e., it must be "something that takes place" (American Heritage Dict. (4th ed. 2000) p. 616) in the employment relationship. Second, the event must be "of employment"; i.e., it must arise out of an employee's working relationship with his or her employer. As we will explain, potential stress factors that arise from broad societal events or trends do not satisfy this requirement of section 3208.3 subdivision (b)(1) because they cannot reasonably be said to be events which arise out of the employment relationship.[2]

---

[2] We note that an event of employment may not be compensable by application of section 3208.3, subdivision (h). It provides, "No compensation . . . shall be paid by an employer for a psychiatric injury if the injury was substantially caused by a lawful, nondiscriminatory, good faith personnel action." (See *City of Oakland v. Workers' Comp. Appeals Bd.* (2002) 99

Third, the language and legislative history of section 3208.3 instruct that the Legislature's public policy goals should be considered when determining whether an award of benefits is warranted. The Legislature made quite clear that it intended to *limit* claims for psychiatric benefits due to their proliferation and their potential for fraud and abuse. Therefore, any interpretation of the section that would lead to more or broader claims should be examined closely to avoid violating express legislative intent. (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.)

With these principles in mind, we turn to the four specific factors cited by the WCAB.

■ First the WCAB ruled Bryan was entitled to benefits because PG&E was "downsizing." Generalized anxiety over one's future in a company struggling to survive during difficult economic times does not fall within the language of section 3208.3, subdivision (b)(1) because it is not a discrete "event" that takes place in the employment relationship. Similarly, fear of job loss due to management strategies to achieve increased profitabilty, such as "outsourcing" of jobs to an overseas workforce, cannot support a compensable claim under section 3208.3. More fundamentally, we conclude corporate downsizing, without more, cannot reasonably support an award of benefits because it is so broad; arguably, all employees who work for a troubled company experience stress. Allowing employees to recover benefits for psychiatric injuries caused by this type of stress would subject employers to virtually unlimited liability. We decline to adopt an interpretation of the section that would so clearly contravene the Legislature's express public policy goal of reducing the cost to the workers' compensation system by reducing the amount of compensable psychiatric injuries. (See § 3208.3, subd. (c).)

■ The second factor, the fact that Bryan's new assignment required him to interact with irate customers on a daily basis, resulted from the elimination of his prior position by the corporate downsizing. Despite the apparent contradiction, we conclude, nonetheless, the WCAB could validly rely on this factor. According to the record, because PG&E was downsizing, Bryan was forced to look for another job with the company. The job he selected, working at the front counter of a local PG&E office, turned out to be an extraordinarily stressful position. While still working, Bryan first sought medical care for his chest pain in 2000, when customer-counter work started to change with an increase in customer complaints. As the state experienced power brownouts and blackouts in the summer of 2001, the "public [Bryan] dealt with thought that it was a big scam and that PG&E manipulated the rates . . ." Bryan left

Cal.App.4th 261 [120 Cal.Rptr.2d 873].) No party has argued that this section applies under the facts of this case.

PG&E permanently in October 2001. The WCAB could reasonably conclude that Bryan's confrontations with angry, threatening or deceitful customers packed in large numbers in a confining small office caused him specific and identifiable work-related stress. Unlike corporate "downsizing," these stresses were a direct consequence of Bryan's new work assignment, an event of his particular employment, and a compensable cause of his psychic injury.

We reach a different conclusion with respect to the third factor: Bryan's stock losses. According to the record, Bryan *voluntarily* invested his retirement funds in PG&E stock, believing it was in his best interests to do so. There is no evidence that Bryan was *obligated* under the terms of his employment to invest his retirement funds that way; nor is there evidence of an employer incentive to invest in PG&E stock. His investment loss was no different from that experienced by the general investing public. We conclude Bryan's personal decision to invest in PG&E stock, and the fact that the stock later lost value, were not "events of employment" that could validly support an award of benefits for psychiatric injury.

The fourth factor, Bryan's concern over "the future of PG&E" and his "retirement funds," describes related circumstances, neither of which was a proper factor under section 3208.3 subdivision (b)(1). The former—anxiety over "the future of PG&E"—implies a feared loss of job security. This factor cannot validly support an award of benefits because it was not a circumstance peculiar to Bryan's work experience, but would have been common to all PG&E employees. The latter—concern over retirement fund stability and value—could not validly support an award because, as we have said, Bryan's personal decision to invest his retirement funds in PG&E stock was not an employment event. Moreover, reliance on these circumstances undermines the legislative goal of restricting compensable psychiatric claims by inviting claims from any employee who suffers or fears a lay-off in economically uncertain times, or from any employee who has incurred a real or paper loss in an investment in employer-issued stock.

Having concluded the WCAB improperly relied on certain factors when making its decision, we turn to the issue of prejudice. The question is whether it is reasonably probable PG&E would have obtained a more favorable result absent the error identified. (Cf. *Redner v. Workmen's Comp. Appeals Bd.* (1971) 5 Cal.3d 83, 93, fn. 11 [95 Cal.Rptr. 447, 485 P.2d 799]; *Beverly Hills Multispecialty Group, Inc. v. Workers' Comp. Appeals Bd.* (1994) 26 Cal.App.4th 789, 806 [32 Cal.Rptr.2d 293].) We conclude that the answer is yes. Benefits under section 3208.3, subdivision (b)(1) may be awarded only when industrial factors account for more than 50 percent of a psychiatric disability. (*Department of Corrections v. Workers' Comp. Appeals Bd., supra,* 76 Cal.App.4th at p. 816.) The Legislature has made quite

clear that claims for benefits of this type must be evaluated under strict and exacting standards. (See § 3208.3, subd. (c).) Here, three of the four factors upon which the WCAB relied were invalid. Those factors appear to have been central to the board's decision. Under these circumstances, we conclude it is reasonably probable the WCAB would have reached a different result absent the error.[3]

## III. DISPOSITION

The ruling of the WCAB is annulled. The case is remanded to the WCAB so it can reconsider the matter in light of this opinion.

Simons, J., and Gemello, J., concurred.

---

[3] While we remand the case to the WCAB to so it can reconsider its decision, we state no opinion on what decision the WCAB should reach.