Filed 4/9/25  The Pinza Group v. Virk CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PINZA GROUP,<br><br>     Plaintiff and Respondent,<br>v.<br>GURCHARN VIRK,<br>     Defendant and Appellant. | A168863<br><br>(Alameda County Super. Ct.<br> No. RG20055991) |

The Pinza Group (Pinza Group), a licensed real estate broker, filed a complaint against Gurcharn Virk alleging breach of contract in connection with listing agreements for three properties.  The trial court entered judgment in Pinza Group's favor in connection with two of the three listing agreements.  On appeal, Virk contends the trial court erred in finding that Pinza Group satisfied its contractual duties, failed to adequately consider certain affirmative defenses, and awarded excess damages.  We affirm the judgment.

**BACKGROUND**

Pinza Group and Virk entered into listing agreements for three of Virk's properties: (1) 1015 University Street (University); (2) 1314 Delaware (Delaware); and (3) 1949 Milvia (Milvia).  University and Milvia are mixed use commercial and residential properties, whereas Delaware is solely a residential property.

The parties entered into the initial listing agreements in February 2019, with expiration dates in mid-August 2019.  During this period, Pinza Group marketed the properties through online listings, including the Multiple Listing Service (MLS) and LoopNet, postcard mailings, letters, emails, and telephone calls to prospects, and open houses.  However, the properties did not sell due to various problems attributed to Virk, such as maintenance issues, regulatory violations, failure to provide keys, and a lack of reliable financial information.

In early August 2019, prior to expiration of the initial listing agreements, Virk emailed Steven Pinza, Pinza Group's principal, to " 'cancel[ ] all my listings since they not sold and already expired.' "  Pinza did not inform Virk that the listing agreements were still in effect; he instead responded with a demand for mediation and removed the properties from the MLS and LoopNet.

When Virk subsequently learned from her mortgage broker that the listing agreements had not expired, she sought to confirm the actual expiration date with Pinza and requested the agreements remain "active."  Pinza immediately emailed the mortgage broker and stated, "Dude, what the f*ck?  I didn't ask you to get involved.  You completely f*cked me here.  Now I may not win at arbitration."  Pinza responded to Virk and restated his position that she "cancelled the contract" and owes Pinza Group "a full commission on all three properties."

Following numerous email exchanges between Pinza and Virk, the parties entered into a second set of listing agreements for the three properties.  During negotiations for the second set of agreements, Virk requested Pinza "remove 365 days from the listings expire time" and "change

2

into 90 days." Pinza stated he had made the change but did not do so; Virk still proceeded to sign the agreements.[1]

After the parties executed the second set of listing agreements, Pinza informed Virk he was arranging for new photographs and "[o]nce those are done . . . we will update our packages and go back out to market next week." Pinza requested Virk arrange for some "last minute cleanups" at the properties and requested copies of keys for all units. Pinza explained, "we want to make it seem like you are an organized seller, so if we have all keys it will make you look better and therefore make it easier to sell the properties." Virk responded, "[t]oo bad[.] I am not organizer person. . . . How about if you do not put in market. [J]ust sell pocket listings." Pinza objected to her suggestion, stating "No, they are all going on the market. Even with the reductions, we are still super high."

In mid-August, the record indicates Pinza continued to try to obtain a complete set of keys. On October 29, 2019, the parties exchanged emails disagreeing about the appropriate pricing for the properties and ongoing property violations. In these email exchanges, Pinza offered to assist with resolving violations with the City of Berkeley, and Virk accused Pinza of harassing and threatening her. The record provided on appeal does not

---

[1] The trial court's statement of decision noted that Virk testified she signed the agreements only because Pinza threatened litigation. However, this testimony is not contained in the appellate record. The only applicable statement arose in response to the question, "Was the Pinza Group's failure to put the property on the multiple listing service in relation to the August listing agreement, was that motivation for you to cancel the listing agreement with them?" In response, Virk testified, "Steve pressured me in that I have buyer. You should list the property with me as soon as possible, otherwise I will sue you." The court then sustained Pinza Group's objection to that testimony as nonresponsive.

appear to contain any evidence regarding the parties' communications between mid-August and the end of October.

During this period, however, Pinza did not immediately relist the properties on the MLS or LoopNet. Pinza testified LoopNet did not allow a removed listing to be relisted for 60 days, although other testimony indicated LoopNet could waive this policy. Pinza also testified he delayed relisting with the MLS because he did not want the listings to appear "stale." However, Pinza marketed the properties through other means, including outdoor signage, postcard mailings, and email communications.

Pinza received offers for Delaware, but the sale was not finalized due to a lack of financials, lack of keys, and maintenance issues. The same problems with the properties that existed during the initial listing period continued during the second listing period.

On November 1, 2019, Virk informed Pinza she was "immediately terminat[ing]" the listing agreements for all three properties due to Pinza's failure to list them on the MLS. Pinza communicated this termination to various prospects, one of whom ultimately purchased Milvia.

Pinza Group subsequently filed a complaint for breach of contract. It alleged it entered into listing agreements for the Delaware, University, and Milvia properties from August 8, 2019 to April 9, 2020, and those agreements provided for payment of a five percent commission of the listing price if, without Pinza Group's consent, Virk withdrew the properties from the market. The complaint further alleged Virk withdrew the three properties from the market on November 1, 2019 and refused to pay the required commissions.

Virk denied these allegations and raised various affirmative defenses, including "duress and undue influence" and "unclean hands." Virk also filed

4

a cross-complaint, alleging breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and negligence.

Following a five-day bench trial, the court issued a statement of decision in Pinza Group's favor. In evaluating the three listing agreements, the court concluded Pinza Group "did all or substantially all of the significant things that the contracts required it to do" as to the Milvia and University properties. It concluded that any delay in listing the Milvia and University properties on the MLS or LoopNet "was reasonable," and credited Pinza's testimony to find that "any failure to list was not a material breach." Conversely, the court concluded Pinza Group's failure to list the Delaware property on the MLS violated that listing agreement.

The court also rejected Virk's defenses. First, it "did not find that Pinza threatened or harassed Virk such that Virk was excused from performing under the contract[s]." Next, the court found "that Virk did not meet her burden to demonstrate duress." It explained that, at the time the parties executed the second set of listing agreements, Virk "was fully informed as to the duration of the prior contract," "is a reasonably sophisticated and experienced business person," and "could have chosen to consult with an attorney . . . but did not do so." Finally, the court concluded Virk did not "demonstrate undue influence" because "[a]t the time she negotiated the second listing agreement with Pinza, she was not in a relationship of trust or confidence with him."

Accordingly, the court awarded Pinza Group contract damages amounting to five percent of the list price for the Milvia and University properties. The court further noted that while Pinza Group had breached the Delaware listing agreement, Virk "offered no evidence to support damages."

Virk timely appealed from the judgment.

5

Virk raises three arguments on appeal. First, she contends the trial court improperly found that Pinza Group's failure to market the Milvia and University properties on the MLS did not constitute a material breach of the listing agreements. Second, she asserts the trial court did not adequately consider her affirmative defenses of unclean hands and economic duress. Finally, Virk argues the trial court erred in awarding a five percent commission under the terms of the listing agreements.

## I. Termination of the Listing Agreements

Virk asserts she was entitled to terminate the listing agreements based on Pinza Group's failure to list the properties on the MLS. She contends marketing the properties on the MLS was a material term of the listing agreements, Pinza Group breached that term by failing to list the properties on the MLS, and the trial court erred in holding otherwise.

### A. Rules of Contract Interpretation

Our goal in interpreting a contract is to give effect to the mutual intention of the contracting parties at the time of contract formation. (Civ. Code, § 1636.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which it was made and the matter to which it relates. (*Id*., §§ 1639, 1647.) We consider the contract as a whole and interpret its language in context giving effect to each provision, rather than interpret contractual language in isolation. (*Id*., § 1641.) We interpret words in their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id*., § 1644.)

Extrinsic evidence is admissible to explain the meaning of a written contract provided that the contract is reasonably susceptible of the meaning

supported by the extrinsic evidence. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343; *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [" 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' "].)

### B.  The Listing Agreements

Section five of the listing agreement,[2] entitled "Multiple Listing Service," provides "Unless otherwise instructed in writing the Property will be listed with the MLS(s) . . . ."  The listing agreement then contains form language describing the MLS, summarizing the benefits of using MLS, and explaining the impact of opting out of the MLS.  The section also states, "MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement."  The listing agreement is silent as to any timeframe for placing commercial properties on the MLS.

Section seven of the listing agreement, entitled "Broker's and Owner's Duties," states in relevant part: "Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Listing Agreement. . . . Broker is authorized to . . . advertise and market the Property in any method and medium, including the internet, selected by Broker, and, to the extent permitted by these media, including MLS, control the dissemination of the information submitted to any medium."

---

[2] The University and Milvia listing agreements are identical apart from the property addresses.

7

## C. Analysis

The listing agreements for the University and Milvia properties do not explicitly require Pinza Group to list the properties on the MLS within a certain time. Rather, the agreements indicate the properties "will" be listed at some point, within the context of Pinza Group's judgment and fiduciary duties. Because of this ambiguity, it was appropriate for the trial court to consider extrinsic evidence to evaluate whether Pinza Group's delay in listing the properties on the MLS constituted a breach of the agreements.

In concluding the delay did not violate Pinza Group's contractual obligations, the court held, "Any delay in listing the properties on the MLS or LoopNet was reasonable given the lack of keys; lack of financials; and conditions of the units. . . . [T]he court credits the testimony of [Pinza Group's expert] and S. Pinza relating to (1) the importance of having these issues reduced or resolved before a commercial property may reasonably be marketed through online listing services; and (2) the value of other forms of marketing with respect to commercial properties. The court also credits the testimony of [Pinza Group's expert] and S. Pinza that the MLS is more oriented to residential than commercial properties, such that any failure to list was not a material breach even to the extent it was not excused by Virk's failure to get the properties reasonably in shape to be effectively marketed."[3] The court also cited Pinza's trial testimony to identify two additional justifications for the delay: (1) an inability of the parties to agree on pricing;

---

[3] Virk argues the trial court improperly relied on Pinza Group's expert's rebuttal testimony because it exceeded the scope her expert's testimony. However, we cannot evaluate the merits of this argument because she has not provided transcripts or a settled statement of her expert's trial testimony. In any event, we note the trial court found Pinza Group's expert's testimony on these issues "cumulative" of Pinza's testimony, which it also found credible.

and (2) negative assumptions that would arise from immediately relisting the properties on the MLS after delisting them.

Virk raises various fact arguments to contradict the trial court's findings and conclusion. Virk contends: (1) Pinza promised to list the properties on the MLS; (2) "Both parties considered the MLS clause to be a material term"; (3) her expert "was excluded from testifying on the standard practices in sales of commercial verses residential properties"; (4) Pinza Group's initial on those listing agreement pages containing information about the MLS "was an apparent endorsement of the value of the MLS and the parties' intentions to employ it"; (5) Pinza's decision to use the listing agreement form at issue hid his intent not to use the MLS; and (6) Pinza did not inform Virk that the properties could not be listed due to "lack of keys; lack of financials; and conditions of the units," and he was aware of those issues before accepting the listings.[4]

Fatal to Virk's appeal, however, is her failure to provide a reporter's transcript or settled statement of Pinza's trial testimony. "In numerous situations, appellate courts have refused to reach the merits of an appellant's claims because no reporter's transcript of a pertinent proceeding or a suitable substitute was provided." (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186 (*Foust*), citing cases.)

We find *Foust, supra,* 198 Cal.App.4th 181 instructive. In that case, the plaintiff alleged on appeal that the defendant breached his written employment contract and the trial court erred in finding his contract

---

[4] Virk does not cite any evidence to support her assertions apart from the listing agreements and emails in which Pinza stated he would "market" the properties. And, as noted by the trial court, Pinza's testimony and certain trial exhibits demonstrate he did so via outdoor signage, postcard mailings, and email communications.

9

subsequently modified. (*Id*. at p. 183.) However, the plaintiff did not provide a reporter's transcript, and only included a partial clerk's transcript and two of the trial exhibits. (*Id*. at p. 186.) The court refused to reach the merits of his claims on appeal. (*Id*. at p. 187.) It explained, "Foust's claim that the trial court's decision 'is contrary to the law and contrary to the actions of the parties' cannot be resolved on an appeal utilizing only selected excerpts from the clerk's transcript. Without a reporter's transcript or the exhibits presented at trial we cannot undertake a meaningful review of Foust's argument on appeal." (*Ibid*.) The court concluded Foust "has failed to present a colorable claim that the trial court erred. . . . Without a proper record, there is no way for this court to find that the trial court's conclusions were not supported by substantial evidence." (*Id*. at pp. 188–189.)

Virk's claims fail for similar reasons. In concluding Pinza Group's delay was reasonable, the trial court relied heavily on Pinza's testimony regarding the reasons for the delay. The trial court specifically concluded Pinza was credible on these issues. And while Virk argues the issue is purely one of contract interpretation, the issues are obviously factual—e.g., Pinza's promises and intentions regarding if and when to list the properties on the MLS, and the reasonableness of his delay in listing the properties.[5] Without a reporter's transcript or a suitable substitute of Pinza's testimony, we cannot conclude the trial court erred.

## II. Virk's Affirmative Defenses

Virk also contends the trial court failed to adequately consider her affirmative defenses of (1) unclean hands, and (2) economic duress.

---

[5] We reject Virk's argument that these issues are inappropriate attempts to contradict, supplement, or vary the unambiguous terms of the listing agreements. As noted above, the listing agreements did not impose specific timelines for listing commercial properties on the MLS.

### A. Unclean Hands

We decline to consider Virk's argument regarding the unclean hands doctrine. While Virk's trial brief discussed Pinza's problematic conduct in the termination of the initial listing agreements and asserted such conduct (1) constituted a breach of his fiduciary duties, gamesmanship, bad faith, and economic duress, (2) induced Virk's reasonable reliance, and (3) voided the listing agreements, nothing in the record indicates Virk briefed and argued the doctrine of unclean hands at trial. A party may not argue theories on appeal that were not raised before the trial court. (See, e.g., *Rubinstein v. Fakheri* (2020) 49 Cal.App.5th 797, 808 ["[a]lthough Fakheri asserted the statute of limitations as an affirmative defense in his answer, he did not raise it at trial. We decline to consider an argument that Fakheri did not make below"]; *Fed. Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 354–355 [defense of unclean hands forfeited if not raised in trial court proceedings].)

### B. Economic Duress

"The doctrine of 'economic duress' can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract." (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 644.) Whether a reasonably prudent person has a reasonable alternative is a factual determination generally not susceptible to determination as a matter of law. (*Ibid*.)

The trial court rejected Virk's economic duress argument. The court first acknowledged Pinza's conduct with respect to the termination of the first listing agreements was problematic—i.e., Pinza failed to correct Virk's misunderstanding regarding the first listing agreements' duration and

11

attempted to capitalize on her mistake, which may have violated his contractual and fiduciary duties to Virk. However, the court concluded Virk failed to demonstrate duress. Specifically, the court noted, at the time the parties entered into the second set of listing agreements, Virk "was fully informed as to the duration of the prior contract," was "a reasonably sophisticated and experienced business person," and "could have chosen to consult with an attorney at that time, but did not do so."

On appeal, Virk argues the court erroneously applied the standard for duress rather than economic duress. We note Virk only asserted "duress" as an affirmative defense, although her trial brief framed the issue as economic duress. Even if we accept Virk's argument, she fails to demonstrate that the error was prejudicial. (*Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772–773 ["An appellant bears the burden to show not only that the trial court erred, but also that the error was prejudicial in that it resulted in a miscarriage of justice"]; see also *Pacific Gas & Electric Co. v. Workers' Comp. Appeals Bd.* (2004) 114 Cal.App.4th 1174, 1183–1184 [trial court's application erroneous legal standard generally subject to harmless error review].)

To demonstrate reversible error, an appellant must provide an adequate record and "not only present an analysis of the facts and legal authority on each point made, but must also support arguments with appropriate citations to the material facts in the record. If [s]he fails to do so, the argument is forfeited." (*Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324.) Here, Virk claims she was "coerced" into signing the agreements to avoid a lawsuit by Pinza, but she cites no evidence to support this statement. Neither the record nor the trial transcripts provided on appeal offer any substantive explanation for Virk's decision to enter into the second listing

12

agreements.  Nor does Virk cite any evidence indicating that she believed the contracts were unfavorable or that she lacked other alternatives.  To the contrary, the trial court noted Virk was "reasonably sophisticated," Virk testified she had sold commercial properties "many times", and Virk alleged she knew "many brokers."

The only evidence Virk cites to support her claim of economic duress is the short duration between her email to retract her cancellation of the initial listing agreements and her execution of the second listing agreements.  But this evidence does not demonstrate Virk believed she had to execute an unfavorable contract because she had no reasonable alternative.  (See *CrossTalk Productions, Inc. v. Jacobson*, *supra*, 65 Cal.App.4th at p. 644.) Rather, these emails indicate Virk was aggressively responding to any perceived threats by Pinza—she told him to proceed with suing her, stated she would bring in witnesses who would testify to Pinza's failure to pursue leads on prospective buyers, identified additional issues with Pinza's efforts to sell the properties, and threatened to file a written complaint with the Better Business Bureau.  While the parties reached resolution quickly, none of the evidence indicates that their resolution—i.e., the second set of listing agreements—was the result of economic duress.

In sum, Virk failed to cite any evidence to support her claim of economic duress.  Accordingly, any error by the trial court in applying a standard for duress rather than economic duress was harmless.

## III.  Pinza Group's Commission

Finally, Virk argues the trial court erred in awarding a five percent commission as damages instead of a three percent commission.  While she asserts "the trial court interpreted the contract incorrectly," she does not cite a single provision of the parties' listing agreement.  Rather, she raises

various equitable arguments, asserting Pinza Group did not "work[ ] hard" or did not find " a ready willing and able buyer," and "[t]his is *not* a case which screams for justice for a real estate agency." While all these statements may be true, none of her arguments indicate the trial court erroneously interpreted the contract. And Virk's failure to provide any citation to relevant authority or the record is fatal to her argument.[6] (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.)

## IV. Motion for Sanctions

While this appeal was pending, Pinza Group filed a motion for sanctions. That motion raises two arguments. First, Pinza Group asserts the appeal is frivolous because the appeal fails to provide an adequate record or citations to the record, does not present a balanced view of the evidence, and misrepresents or contradicts the trial court's factual findings. Second, Pinza Group argues Virk initiated the appeal to evade enforcement of the judgment. Specifically, Pinza Group notes that, after the trial concluded and shortly before the statement of decision, Virk recorded "three large deeds of trust against their properties purporting to represent loans to the Virks from Triple Tree Funding." Pinza Group asserts Triple Tree Funding is connected to Virk's home address and appears to be an effort to conceal assets. It notes Virk has utilized the appeal to claim the trial court's judgment is stayed and refuse to comply with post-judgment discovery regarding these loans.

Code of Civil Procedure section 907 provides, "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may

---

[6] Moreover, we note the listing agreements unambiguously state "Owner agrees to pay to Broker as compensation for services . . . 5.000 percent of the listing price . . . as follows: [¶] . . . (3) If, without Broker's prior written consent, the Property is withdrawn from sale, lease, exchange, option or other . . . during the Listing Period, or any extension thereof."

14

add to the costs on appeal such damages as may be just." California Rules of Court, rule 8.276 provides: "(a) Grounds for Sanctions [¶] On motion of a party or its own motion, a Court of Appeal may impose sanctions, including the award or denial of costs under rule 8.278, on a party or an attorney for: [¶] (1) Taking a frivolous appeal or appealing solely to cause delay." "Neither the Rules of Court nor the statutes provide any guidance as to the definition of a frivolous appeal." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 646 (*Flaherty*).

"Due process, fundamental fairness and the integrity of our judicial system all require that counsel be permitted to pursue their clients' interests with the confidence that they will not be singled out at random for sanctions. In proper cases, the imposition of penalties for prosecuting a frivolous appeal may be fair and may serve the useful purpose of deterring similar conduct. However, such sanctions should be imposed rarely and only if the mandates of procedural due process are obeyed." (*Flaherty*, *supra*, 31 Cal.3d at p. 654.)

"To determine whether an appeal is frivolous, we apply both a subjective standard, examining the motives of appellant and its counsel, and an objective standard, analyzing the merits of the appeal." (*Malek Media Group LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 834.) An appeal is considered objectively frivolous " ' "when any reasonable attorney would agree that the appeal is totally and completely without merit." ' " (*In re Marriage of Schnabel* (1994) 30 Cal.App.4th 747, 754.) In *Foust*, *supra*, 198 Cal.App.4th 181, the court granted the respondent's motion for sanctions based on the appellant's failure to provide a complete clerk's transcript or a reporter's transcript. (*Id.* at pp. 187–189.) The court explained, "sanctions are warranted because Foust's appeal is indisputably without merit. As shown by our discussion of the issues that Foust has raised, he has failed to

15

present a colorable claim that the trial court erred. . . . Without a proper record, there is no way for this court to find that the trial court's conclusions were not supported by substantial evidence." (*Id.* at p. 189.)

We decline to award sanctions based on the adequacy of the record. While Virk's failure to provide a trial transcript or settled statement for certain days is fatal to her claims on appeal, as discussed above, the missing evidence is not comparable to *Foust*. Here, Virk submitted all available records, including a complete clerk's transcript and sets of trial exhibits. Accordingly, we decline to find that the missing trial testimony evidence—for which no reporter's transcripts were created—justify sanctions.[7]

With regard to Virk's post-judgment conduct, those issues are not before this court. If Pinza Group believes Virk is impermissibly obstructing its post-judgment discovery rights, its remedy is to raise the issue with the trial court. (Accord, *Fish v. Guevara* (1993) 12 Cal.App.4th 142, 148 ["Because expert witness fees are not incidental to the judgment, the propriety of a post-judgment award of expert witness fees cannot be reviewed on an appeal from the judgment. An award of expert witness fees must be challenged by a timely notice of appeal therefrom."].) Moreover, we note the issue raises numerous fact questions which are best resolved by the trial court in the first instance. (See *MMM Holdings, Inc. v. Reich* (2018) 21 Cal.App.5th 167, 187.)

Accordingly, we deny Pinza Group's motion for sanctions.

---

[7] Likewise, we conclude Virk's minimal citations to the record impact the merits of her appeal but do not justify sanctions. (See *Flaherty*, *supra*, 31 Cal.3d at p. 654 ["sanctions should be imposed rarely . . . ."].)

**DISPOSITION**

The judgment is affirmed.  Pinza Group is entitled recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____

PETROU, J.

WE CONCUR:

_____

TUCHER, P. J.

_____

FUJISAKI, J.

A168863/*Pinza Group v. Virk*