Filed 3/28/14  Purcell v. Corriveau CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RANDALL PURCELL,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>BRYAN PETER CORRIVEAU,<br><br>        Defendant and Respondent. | A136030<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVPO 09-54824) |

Randall Purcell sued Bryan Peter Corriveau for over $500,000 in compensatory and punitive damages arising out of his time as Corriveau's tenant and employee.  All of Purcell's claims were rejected in a court trial.  In its statement of decision, the court noted that Purcell supported his claims with "only his own testimony, as well as numerous documents, many of which were prepared well after the fact. . . ."  The court found that Purcell's "testimony and the inferences he asks the Court to draw from his view of the facts are not credible."  This finding is largely fatal to Purcell's many contentions on appeal, which primarily contest factual determinations that are supported by substantial evidence.  We affirm the judgment for Corriveau.

## I.  BACKGROUND

Corriveau was denied entry from Canada into the United States when the case was tried, and it was agreed that his testimony would be provided by his deposition introduced into evidence.  Corriveau testified that he acquired a one-acre property on Highway 101 in Laytonville in 2006.  The main building on the property had a basement, a restaurant space on the ground floor, and an upstairs apartment.  A smaller, 450-square-

1

foot building on the property was used for storage. The property was previously the "Laytonville Inn," a restaurant that went out of business in 2005, and was succeeded by one called "Two Fat Guys Pizza," which went out of business in early 2006. Corriveau met Purcell in 2005, when Purcell was a minimum wage worker at Two Fat Guys Pizza.

Corriveau said that the larger building was "quite a mess" when he acquired it, and in May 2006 Brian Hoy of the county Environmental Health Division issued an inspection report that identified various necessary repairs to that building. Corriveau hired Robert Porter to work on the renovations, which began that summer. Corriveau hired Purcell to help with the work for $10 per hour. Porter testified that he did most of the electrical work in the larger building, and Purcell assisted by drilling holes and pulling wire. Purcell did the work of a beginning electrical apprentice, and was "more or less" just a laborer.

According to Purcell's testimony, he approached Corriveau in July 2006 about opening a takeout pizza business in the smaller building on the property. He said that Corriveau planned to open a restaurant and bar in the larger building, but had no plans for the smaller one. Purcell admitted that he had no training or experience in managing a restaurant, and no savings or credit, when he proposed the pizza business. But he claimed that he had worked as a pizza cook at age 12, and described himself as "a pro" in the pizza restaurant business. His girlfriend's parents were going to be investors in the business. The parents insisted on a three-year lease with a five-year option to renew, to which Corriveau allegedly agreed. Corriveau testified that he agreed only to a one-year lease of the smaller building for $2,000 in rent per month and, if "everything went okay," to an additional three-year term.

Work began on the smaller building so the business could open on October 1. Porter testified that he redid the building's electrical system, put in plumbing, and installed a shower. Purcell submitted, and Corriveau paid, four invoices for 118.5 hours of work at $10 per hour from August 14 to September 16. The last of the invoices stated: "Peter; [¶] Thank you once again for the opportunity to assist you with the refurbishing project at this location! And I would like to add that the building looks good and I can no

2

longer charge you for my work preformed [*sic*] at this location. I feel that your responsibility as landlord has been fulfilled and from this date forward I will submit my invoices to Justgood Pizza"— Purcell's own business.

At trial, Purcell calculated that Corriveau owed him $5,187.50 for 207.5 hours of work on the smaller building at $25 per hour. He calculated his hours worked based on daily notes he made at the time, some of which went into pocket calendars he was keeping. Some of the notes were added to the calendars later. Purcell testified that Corriveau owed him $25 per hour, instead of $10 per hour, based on his "skill level" and the wages being paid to coworkers. He agreed to accept $10 at the time because Corriveau had agreed to pay for some materials, and to waive prepayment of the $2000 first and last month's rent, on the smaller building.

Purcell applied for a use permit and Hoy, the county inspector, conducted a preopening inspection of the smaller building on September 25. Hoy said that the business could not open until the county approved the septic system on the property. Corriveau testified that, unbeknownst to him, the previous owner had installed a new septic tank without a permit.

Purcell said he started working at this point on the larger building, because Corriveau "asked me to hold off on calling any more county officials for any inspections until he cleaned up some un-permitted work he had started on the large facility." According to Corriveau, Purcell broke up with his girlfriend in October or November, and thus lost his investors. He asked to live on the property, and moved into the apartment in the larger building. They agreed that Purcell would rent the apartment for $800 per month, and that he would work on the property to pay the rent.

Corriveau testified that Purcell lived in the apartment for a couple of months, and then decided to move to the smaller building, where he stayed until June of 2007. According to Purcell, he lived with his girlfriend until April 2007, and then moved to the smaller building and lived there for nine months until December 2007. But he sent an April 13, 2008 email to Corriveau that said he had lived on the property for 14 months, "sleeping on an army cot at a construction site." Corriveau said that while Purcell lived

with him for about a month and a half in June and July 2007, in exchange for work around his residence, "a whole filing cabinet" of documents pertaining to the property went missing from his home. Corriveau believed that Purcell stole the documents because Purcell produced some of them in the litigation. Among the missing documents were his records of how much he paid Purcell for work on the buildings.

The county inspected the septic system on June 29, 2007, and told Corriveau and Purcell that a one-year soil test would be required before Purcell would be allowed to operate his business in the small building. So, Corriveau agreed to lease approximately one half of the ground floor of the larger building to Purcell beginning in August 2007, so he could start his pizza business there pending approval for his use of the smaller building.

The ground floor of the larger building was divided into three areas: the kitchen and main dining room, which Purcell would occupy; a center room; and a bar, which Corriveau was renovating. Purcell's rent was $2,500 per month, and he was responsible for utilities and maintenance on his premises. Corriveau deferred collecting the first month's rent, advanced Purcell $2,500 for start-up costs, and agreed to sell him the equipment that had been used by Two Fat Guy's Pizza. When his Justgood Pizza business opened in the larger building on September 15, 2007, Purcell had to borrow $100 for petty cash to make change.

Purcell testified that Corriveau promised to bring him a lease agreement on the day the restaurant opened, but failed to do so. Corriveau said that, on September 29, he drafted a lease and $7,500 promissory note for Purcell's signature. The pre-printed lease had an amendment that stated: "At this time lessee shall remain on a month to month lease basis until such time prior agreed to ajacent [*sic*] building is approved for a new use permit. At that time lessee shall vacate present main building location." The promissory note stated that rent payments of $2,500 per month would begin on October 1. The note was for the monthly $2,500 rent for August, September, and the last month of the tenancy, and required minimum payments of $2,500 per month.

4

Purcell testified that Corriveau gave him the proposed lease on December 11, and that he declined to sign it because it did not reflect their agreement. Purcell was expecting a lease for the smaller building that "encompass[ed] a one-year temporary operation period in the larger facility." He said that, by this time, Corriveau had agreed to grant him an option for a ten-year lease on the smaller building because he had worked for Corriveau for months without compensation. They had further agreed that Purcell was borrowing $10,000 from Corriveau for "the value of the [restaurant] equipment, a $2,500 cash startup, [and] some rent." Purcell said that the lease for the smaller building was supposed to provide that the $10,000 loan would be paid over 36 months, with interest. No commercial lease was ever executed.

Purcell operated his restaurant in the larger building for eight months, until May 2008. His friend Kary Foltz kept track of his income and expenses from October 2007 until the business closed. C.P.A. Joan Sturges testified for Purcell that Foltz's log books and other records showed that the restaurant had $1,226 in average daily sales during its first 55 days of operation. Thereafter, average daily sales dropped to $551. Purcell paid rent into a bank account Corrieveau designated in September, October, and November. Purcell testified that he paid the December rent to Corriveau with cash on hand when Corriveau came to the restaurant on December 11, but he obtained no receipt for the payment.

Corriveau received no further rent from Purcell apart from a $500 payment in February, and in April served him with a 30-day notice to quit. In May, Corriveau told Purcell that he was reducing the rent from $2,500 to $2,000, and that he would not proceed on the notice to quit if Purcell paid $1,000 in the first two weeks of May, and another $1,000 by the end of the month. Purcell made no payment and surrendered the premises on May 19.

Purcell sued Corriveau in October 2009, asserting causes of action for negligence, negligence per se, fraudulent concealment, fraud, intentional infliction of emotional distress, and "wrongful eviction." At trial, Purcell blamed Corriveau for the restaurant's failure. Purcell said that the heater Corriveau installed in the restaurant in October 2007

5

was inadequate. Business fell off on November 10 when construction began to replace a water main on Highway 101. Robert Porter testified that the project lasted three or four weeks, and Purcell said the project blocked access to the restaurant from the highway. Purcell testified that "plenty of notices [about the project] had gone to the owners of the properties on that road but never was a word breathed to me until the day before they started the construction on it. . . ."

Purcell said that, around the same time as the road construction began, Corriveau resumed renovation of the adjacent bar area, which disrupted the restaurant's operation in various ways. Smells of lacquer, cigarettes, and marijuana drifted from the bar area under a doorway and into the restaurant. Work in the bar area included removal of exterior walls, which added to the cold in the restaurant. Construction workers on the bar blocked access to Purcell's propane tank with debris.

Corriveau was not asked whether he had advance notice of the road construction, and evidence was admitted to refute all of Purcell's other claims. Kelly Dehoff, who reopened a restaurant in Purcell's former space in September 2008, testified regarding the temperature in the restaurant. She said that the heater worked well after a two-dollar part was replaced. She also said that "we had a nine-foot conveyor pizza oven in the kitchen and the restaurant isn't huge or anything. So, between the oven and the wall heater, we actually got kind of hot." Kenneth Kelly said that he ate at Purcell's restaurant once a week, and described the restaurant as "comfortable."

Porter denied that work in the bar disrupted Purcell's operations. He and the other workers prevented odors from drifting into the restaurant by taping plastic over openings between the spaces, and blowing air from inside the bar to the outside with vents. Brian Wilberger delivered propane to Purcell and testified that there were "some obstructions [to the tank], but nothing I couldn't get by." He said that if there was debris by the tank "I would either just move it out of the way or just walk over it." He thought Purcell's pizza was "not really great."

C.P.A. Sturges determined that Purcell lost profits due to the "[c]onstruction . . . on adjacent property" that allegedly disrupted the business beginning on November 10,

6

2007, and caused it to fail. Based on the first 55 days of operation before the disruptions, Sturges calculated that Purcell stood to make $77,000 annually from the business. Sturges concluded that Purcell lost a total of $378,812 in the business "($77,000 net income x 4 years + $70,812 initial investment)" from November 10, 2007, to the time of trial in 2011.

Sturges did not know that after the first year Purcell planned to transition to a take-out business in the smaller building on the property. Her income and expense projections were based on the "walk in, sit-down," business Purcell conducted in the larger building. She acknowledged that restaurants can have a one or two month "honeymoon period" when customers first try them out, and thus that Purcell's initial earnings might have been an aberration. She also acknowledged that the average restaurant stays in business for only two years.

In addition to lost earnings, Purcell sought to recover $51,387.50 for the alleged value of his construction labor, which consisted of $5,187.50 previously mentioned for work on the smaller building, and $52,200 for work on the larger building, less the $6,000 he estimated he received from Corriveau. His alleged economic losses also included $7,675 in "reliance damages" for time he spent preparing his plans and use permit application for his business, and $5,749.08 in expenditures he made on the buildings. In addition to the total economic damages of $433,623.58, Purcell asked for "at least $100,000 in emotional distress damages," and punitive damages.

The court rejected all of Purcell's claims in a 19-page statement of decision. The court observed that the claims were supported "essentially only [by Purcell's] own testimony, as well as numerous documents, many of which were prepared well after the fact . . . ." The court found "[i]n general . . . that defendant's testimony and that of Mr. Porter was consistent, logical and reasonable, and therefore more credible than that of plaintiff. Plaintiff's testimony and the inferences he asks the court to draw from his view of the facts are not credible." The court enumerated three points on which Purcell's testimony was "false or improbable," five points on which his evidence was conflicting, and then wrote:

7

"The above are simply a few examples of inconsistencies or problems in plaintiff's case; the court, having observed plaintiff for several days during his testimony, finds much of his testimony self-serving and improbable. Plaintiff's constant assertion that he was promised a lease for three years, for example, when he had no experience running a business, no capital, no investors, no credit and no cash, simply is not believable in light of the much more reasonable position of defendant that the parties would enter a lease for one year and then if all proved successful would enter a longer lease."

The court went on to explain why it ruled for Corriveau on each of the pleaded causes of action, and on Purcell's claim for recovery in quantum meruit.

## II. DISCUSSION

A. Quantum Meruit

The court rejected Purcell's claim that Corriveau owed him for construction work performed without compensation, finding that the value of the work was less than the amounts Purcell owed Corriveau. Purcell argues that this finding was not supported by the evidence.

"In evaluating this claim, we apply the familiar substantial evidence standard of review: We view all of the evidence in the light most favorable to the judgment, drawing every reasonable inference and resolving every conflict to support the judgment." (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24.) "[A]lthough appellant repeatedly contests the weight and credibility of the testimony presented, this court will not reweigh evidence, reappraise the credibility of witnesses, or resolve factual conflicts contrary to the trial court's findings, but will only decide whether there is substantial evidence to support these findings." (*Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195.) If such evidence exists, " 'it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' " (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 612.)

The court's finding that Purcell owed Corriveau money and not vice-versa was based on several factual determinations. The court found that Purcell "was fully paid for

8

work he performed on the small building, through September 2006"—a finding Purcell does not appear to contest—and the court rejected Purcell's claim to $52,200 for work performed on the larger building from September 2006 to September 2007. That figure was based on forty-hour work weeks at $25 per hour, but the court found that Purcell worked only 20 hours per week, and that the value of his labor was only $10 per hour.

Both findings were supported by substantial evidence. Purcell presented no evidence other than his testimony that his labor was worth $25 per hour, and the court did not find him to be credible. Porter's testimony, which the court believed, was that Purcell was not as skilled as he professed to be. Porter said that Purcell was primarily a laborer, and that his only skilled work was painting. Purcell was earning a minimum wage before he went to work for Corriveau, and he charged Corriveau $10 per hour in the only invoices he produced for the court. The court had good grounds for applying the $10 figure.

The court also had good reason to reject Purcell's claim that he worked 40 hours per week in the larger building during the year before he opened his restaurant. When Purcell was asked whether he kept track of the hours he spent working on the larger building, he answered: "I did for a short period of time, but because I wasn't being paid and I couldn't charge Justgood Pizza after they opened for the work on the large building because it wasn't relevant to the small building, so I had no reason to really be keeping track of any records because there was no one to charge. So no I guess is the answer." He could only "approximate" these hours of work because he did not "keep accurate records on a daily basis there." His approximation was based on his pocket calendars and other documents that included "receipts for purposes which would identify what items I was working on that day. Inspection reports and et cetera where I was present and worked with officials. Receipts for subcontractors where I had assisted them and coordinated with them on the project. [¶] I have telephone call details because I do not drive and I had to call for a ride home every night. I would know my departure time for the evening, for that evening, and Robert Porter, my coworker at the time, would pick me up each morning at the same time, 7:20 a.m. So I was able to use my call details to

9

determine when I returned home at the end of the day and knew that Robert Porter picked me up at a certain time every day. So it was a combination of all those things is what went into how I prepared what hours I put into that building."

This testimony illustrates just one aspect of the overall weakness of Purcell's case. Purcell's pocket calendars showed that Corriveau paid him at least $3,650 for his work from December 1, 2006, to July 30, 2007, so having "no one to charge" was no excuse for failing to keep accurate records of his time. Other than the pocket calendars, none of the contemporaneous documents allegedly substantiating the hours worked—receipts, inspection reports, and telephone records—were introduced into evidence. The claim that phone records would have reflected time worked was especially implausible. Those records would allegedly have shown the timing of rides Purcell received to and from the property, but the court determined, consistent with Purcell's April 13, 2008 email, that he lived there for 14 months. This period would have included virtually all of the time he worked on the larger building before opening the restaurant if, as Purcell testified, he lived in the smaller building until December 2007. Thus, the court could find that he was not frequently getting rides to and from the property as he claimed.

The finding that Purcell worked 20, not 40, hours per week was supported by entries in his pocket calendars, which showed that he worked 224 hours over 11 weeks from November 27, 2006, to February 10, 2007. The finding was further supported by Porter's testimony that he worked on the larger building five days a week from about 7:00 a.m. to 4:00 p.m., and that Purcell was present "possibly half the time." The court calculated that Purcell was owed $9,600 if he worked 20 hours per week during the year from September 17, 2006, to September 15, 2007. Our calculation would be slightly more ($10 x 20 hours x 52 weeks = $10,400) but, in any event, Purcell was paid $3,650 during this period according to his pocket calendars. Thus, he was owed at most $6,750 ($10,400 - $3,650) for the value of his labor during this time.

Any such amount owed to Purcell was more than offset by the over $10,000 in unpaid rent the court found Purcell owed to Corriveau on the restaurant. The finding as to unpaid rent was also supported by substantial evidence. As reflected in the promissory

10

note Corriveau asked Purcell to sign in December 2007, rent for the premises was $2,500 per month for five months from August to December 2007, a total of $12,500. Corriveau testified that he agreed in May 2008 to reduce the rent to $2,000 per month, and stated in his pretrial brief that the amendment was retroactive to January 2008. Purcell thus owed $9,000 in rent for four and one-half months from January 2008 to mid-May 2008 ($2,000 x 4.5), and a total of $21,500 in rent ($12,500 + $9,000) for his nine and one-half month tenancy. He paid $2,500 in September, October, and November; he may have paid $2,500 in December; and he paid $500 in February—a total of $10,500, assuming the December payment was made. This left him in debt to Corriveau for $11,000 ($21,500 - $10,500) in unpaid rent. Thus, even after credit for the value of his unpaid labor, Purcell owed Corriveau $4,250 ($11,000 - $6,750) in rent.

The court determined that Purcell owed Corriveau an additional $11,200 in unpaid rent for 14 months of residential tenancy on the property at $800 per month. Purcell disputes that liability, arguing that the smaller building was unfit for residential use. In view of our conclusion that the $11,000 in rent he owed on the restaurant was alone sufficient to offset the $6,750 he was owed for unpaid work, we need not reach this argument.

B. Negligence

In his post-trial brief, Purcell argued that Corriveau was negligent in two respects: he failed to provide a lease for the restaurant with the agreed upon terms, and he disrupted the restaurant's business in several ways. The court found the theory of liability for failing to furnish a lease "nonsensical," noting that a tenant who takes possession and pays rent without a lease " 'enters at his peril,' " and obtains only a month-to-month tenancy terminable on a 30-day notice to quit. Purcell does not dispute the court's legal reasoning, but argues that he obtained "a rental contract under the doctrine of promissory estoppel." However, a tenancy longer than month-to-month would not have assisted Purcell. As the trial court said in its statement of decision, "there is no evidence in the record to suggest that a written lease would have allowed plaintiff to avoid eviction where he had stopped paying rent, as he did here." As Purcell's C.P.A.

11

Sturges testified when asked whether a landlord would typically evict a tenant who failed to pay rent for four months: "I should hope so."

Purcell maintained that Corriveau negligently disrupted his business by installing an inadequate heater, by remodeling the adjacent bar area in ways that interfered with the restaurant's operations, and by failing to warn him of the work planned for Highway 101. In his reply brief on appeal, Purcell concedes that Corriveau may not have known of the roadway work in advance.

As for the heater, Kelly Dehoff, who operated the restaurant after Purcell, said that the heater and pizza oven were more than adequate to warm the premises, and Kenneth Kelly testified that the restaurant was "comfortable" when Purcell ran it. This testimony provided substantial evidence to refute Purcell's contention that Corriveau provided an inadequate heater.

Purcell argues to the contrary as follows: "Kelly Dehoff rented the large building after appellant vacated. Respondent offered no evidence the heater was even the same heater, or, if it was, it was in the same condition it was in when appellant rented the premises. Respondent may well have replaced or repaired the heater after appellant vacated. [¶] Although Ken Kelly testified that appellant's restaurant was comfortable, he was not asked about the heat. His affirmative answer may well have been intended to indicate the restaurant was comfortably appointed. He also testified he 'often ate there at lunchtime.' . . . Daytime is of course warmer than nighttime." These speculations betray a serious misapprehension of substantial evidence review, which requires that all inferences be drawn in favor of, not against, the judgment.

As for the remodeling of the bar, the court could choose to credit Porter's testimony that the work was performed in a manner that prevented any significant disruption of the restaurant, rather than Purcell's contrary testimony.

Moreover, even if some negligent disruption of the restaurant had been proved, the elements of causation and damages were not established as a matter of law. Purcell's initial success might simply have been the "honeymoon period" that Sturges acknowledged is typical for a restaurant, when new customers come in to try the food.

12

Business could be found to have dropped off thereafter because, as propane delivery man Wilberger testified for Corriveau, Purcell's pizza was not that good. Moreover, as Sturges further conceded, restaurants frequently fail within two years. A trier of fact could reasonably find that the hundreds of thousands of dollars of alleged lost profits were unduly speculative.

In his motion for new trial and on appeal, Purcell alleges that Corriveau was also negligent in failing to disclose, before agreeing to rent him the smaller building, that inspector Hoy had found "Health Code violations" in the larger building during his May 23, 2006 inspection. He asserts that he received a copy of the inspection report from Hoy on September 25, 2006, when Hoy inspected the smaller building, and that Hoy told him "the existing Health Code violations in the large building had to be cleared before he could issue a permit for the small building."

However, this argument mischaracterizes the testimony. After being handed the inspection report for the larger building at trial, and while discussing operations in the smaller building, Purcell first said that Hoy told him the report "needs to be dealt with first." But Purcell later clarified that operations in the smaller building were not contingent on repairs to the larger building: "Q. How did that [the inspection report on the larger building] affect your use of the small building? A. Well, because I was asking for a new use permit instead of the one here [for the larger building] with many violations, I was asking for a new use permit you have to get approval [of the existing septic systems] from the Land Use division first. Q. So you—so those items [on the inspection report] had to be cleared before your new use permit would be issued or— A. No. These items are on the larger building. Q. Right. A. And the only thing I needed to address for the small building was approval from Land Use division. I needed Land Use to say okay for the new use, then I could speak with Environmental Health about my facility. Q. I don't understand how that affected your new use permit. A. This [the inspection report]? Q. Yes. A. This doesn't affect the smaller building. This is for the larger building."

13

Since the May 2006 report had nothing to do with approval of operations in the smaller building, Purcell was not harmed by any negligence in failing to disclose the report. Moreover, Purcell does not explain how he was damaged by the delayed opening of his business in the smaller building. He was paid for his work on the smaller building and, as we have explained, even after credit for unpaid work on the larger building, he owed Corriveau $4,250 in rent. Purcell also owed Corriveau other sums, including the $2,500 that Corriveau advanced him to open the restaurant in the larger building, and $1,600 in rent for the two months Purcell occupied the apartment above the restaurant where there were no habitability issues. Those debts were sufficient to offset any portion of the alleged $7,675 in "reliance" damages Purcell could attribute to preparing for operation in the smaller building, and the $104 he said he spent on that building. Again, neither causation nor damage is apparent.

C. Fraud

Purcell contends that Corriveau is liable to him for fraud and fraudulent concealment for failing to disclose the repairs the county was requiring in the larger building. That argument fails for the reasons discussed above in part II.B.

Purcell contends that Corriveau is liable to him for fraudulently concealing that, as a Canadian citizen who had been convicted of a felony, he could not provide him with a social security or tax identification number without risking deportation. Purcell asserts that he needed one of these numbers in order to lawfully deduct the rent he paid in 2007 on his taxes.

However, Purcell incurred no damage as a result of any concealment because he went ahead and deducted the rents anyway. Purcell's counsel asked Sturges, "Was Mr. Purcell's rents that he paid to Peter Corriveau used in calculating any of his income taxes?" Sturges answered, "I used the 2007 taxes. It had rents involved in it, yes. [¶] The 2008 taxes did not because they were not paid." Counsel then told the Court: "Your Honor, at this time, my client had erroneously believed that his rents paid to Mr. Corriveau had not been used for his taxes and that therefore he had to pay additional

14

taxes. [¶] He found out in working with Joan Sturges that they had been in fact included and so we withdraw any portion of the claim based on that."

Purcell's complaint is not that Corriveau's alleged fraud caused him to lose money. It is instead that the malfeasance exposed him to "prosecution for tax fraud" for deducting rent without the necessary documentation. In support of this argument, he cites federal statutes prohibiting false statements to the government and the filing of false tax returns. This theory of liability is difficult to fathom. If Purcell claimed deductions without proper documentation, which is all that presumably happened, then he is subject to audit, not prosecution. If he defrauded the government by deducting rent he did not pay, Corriveau was in no way responsible.

D. Wrongful Eviction

Purcell argues that Corriveau's remodeling of the bar area violated the landlord's implied covenant of quiet enjoyment and caused him to be constructively evicted from the premises. (See generally *Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512 ["a tenant shall have quiet enjoyment and possession of the premises during the continuation of the term"]; *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1152 [a tenant may be constructively evicted "if the landlord engages in acts that render the premises unfit for occupancy for the purpose for which it was leased, or deprive the tenant of the beneficial enjoyment of the premises"].) However, as we have said, the court could find that work in the bar did not disrupt the restaurant.

Purcell contends that Corriveau violated the covenant of quiet enjoyment by harassing him in a May 13 telephone message and a May 16 email, shortly before he surrendered the premises on May 19, 2008.

Corriveau left Purcell the following voice message on May 13: "I don't know what you're—what you're trying to pull off here. You know? You're supposed to give Kyle [Corriveau's son] money on the lease here, so—to extend your rent and, uh, you're not doing what you're being told. And you're trying to baffle him with bullshit. Now, you got two days. Yah—if you don't—now if you're not gonna do it, then you need to

15

leave in two days. And I don't need an excuse or anything. I got—that's my place. You're month to month. You got a thirty-day notice. It's up in two days. All right?"

On May 14, Corriveau sent Purcell an email saying: "[A]t this time I must enforce the eviction notice that was hand delivered to you 04/15/08 by my agent. I ask you now to quit and leave the 44930 hwy 101 property as of 05/15/08. [¶] If you force me to engage the help of authorities or attorney's [*sic*] I will attach all fee's [*sic*] and costs incurred at the time to your credit. [¶] It is now apparent that you have taken advantage of my good nature and played smoke and mirror games instead which, was not in accordance to our agreement. [¶] [Y]ou must leave all equipment that was furnished and pay your pg&E current to avoid additional court proceedings."

Corriveau sent the following email on May 16: "my agent/son kyle has informed me that you think that you['re] going to take the dough press when you leave. [T]his would be very unadvisable! You have not purchased or payed [*sic*] for any of the equipment you originally offered to purchase. [Y]ou have no receipt of payment for any of the said pieces. I will caution that to remove ANY of the listed equipment I sent you via email will result in you being ARRESTED. [T]his is totally final."

The May 13 phone message was left after Corriveau had made a generous offer to allow the tenancy to continue if Purcell paid only $1,000 of the rent owed by mid-May. The May 16 message was sent when Corriveau believed that Purcell intended to take equipment that belonged to him. In context, the messages were not harassing or actionable.

E. Sanctions

Corriveau has moved for sanctions against Purcell and his attorney on the grounds that the appeal is frivolous, and is being prosecuted for improper motives. (See *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) Corriveau contends that the appeal was taken to harass him and cost him additional attorney fees, but he can cite nothing to support that claim other than procedural defaults that Purcell eventually cured and that evinced no improper purpose. "There is no evidence of subjective bad faith. In contrast to most of the cases where sanctions have been imposed, [Purcell] had nothing to

16

gain from delay." (*Id*. at p. 651; see also *id*. at p. 649 [no improper motive where counsel "seemed to believe 'fervently' that he might succeed on the merits"].)

An appeal is frivolous "when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.) Whether this appeal is frivolous is relatively close because, upon analysis, none of Purcell's contentions is remotely persuasive. Nevertheless, "to avoid a serious chilling effect on the assertion of litigants' rights on appeal" (*ibid.*), sanctions for frivolous appeals "should be used most sparingly to deter only the most egregious conduct" (*id*. at p. 651). Sanctions are warranted only in " 'the clearest cases' " (*id*. at p. 650), and this is not one of them.

### III. DISPOSITION

The judgment is affirmed, and the motion for sanctions is denied.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Pollak, J.

17